# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1998-DP-00901-SCT

*RICHARD GERALD JORDAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/24/1998 |
| TRIAL JUDGE: | HON. KOSTA N. VLAHOS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | TOM SUMRALL |
| | WADE M. BAINE |
| | JOHN HOLDRIDGE |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | CONO CARANNA |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL OF RESENTENCING |
| DISPOSITION: | AFFIRMED - 04/26/2001 |
| MOTION FOR REHEARING FILED: | 5/8/2001; denied 6/28/2001 |
| MANDATE ISSUED: | 7/5/2001 |

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**

## FACTS AND PROCEDURAL HISTORY

¶1. Richard Gerald Jordan's appeal presently before the Court is the oldest pending death penalty case in the State of Mississippi. The appeal originates from the kidnapping and murder of Edwina Marter on January 13, 1976, in Harrison County, Mississippi. Since Jordan was convicted and sentenced to death for these crimes, the Supreme Court of Mississippi ("the Court" or "this Court") has reviewed the case five times, including this appeal, the United States Court of Appeals for the Fifth Circuit ("the Fifth Circuit") two times, and the United States Supreme Court ("the Supreme Court") three times. Jordan raises thirty-four

(34) assignments of error in this appeal.

¶2. Jordan traveled to the Mississippi Gulf Coast after he had traded a shotgun for a .38 revolver in Baton Rouge, Louisiana.[(1)] Jordan telephoned the Gulf National Bank and asked to speak to a commercial loan officer. After Jordan was told that Charles Marter could assist him, Jordan found Marter's Gulfport residence address in the telephone directory. He went to the residence and waited until all but one of the vehicles had driven away. Pretending to be an employee of an electric company who needed to check the breakers in the house, Jordan gained entrance to the house. He kidnapped Charles' wife, Edwina, forcing her to leave her three-year-old son sleeping and alone in the house. Jordan told Edwina to drive to a deserted and wooded area in the DeSoto National Forest.

¶3. The defense claimed that, at this point, Edwina tried to run away and Jordan attempted to fire a warning shot over her head. He missed, and the bullet struck Edwina in the back of the head, killing her. The State claimed that Jordan executed Edwina, probably while she knelt on her knees, by firing a bullet into the back of her head. Whatever happened, Edwina most probably died instantly. The physical evidence showed that the bullet, which was never recovered, entered Edwina's skull at the lower right occipital area of the brain and traveled upward and from right to left to exit above the left eye.

¶4. After Edwina was killed, Jordan threw the murder weapon into the Big Biloxi River, where it was later recovered by scuba divers working for the Gulfport Police Department. Jordan then called Charles at the bank, telling Charles that he had kidnapped Edwina and that she was alive and well. Jordan demanded that Charles pay him $25,000 to insure the return of his wife. He also instructed Charles to place the money, wrapped in brown paper, on a blue jacket that would be on the side of U. S. Highway 49. However, when Charles attempted to make the ransom payment, he did not find the jacket. Charles had contacted the FBI prior to making the payment, and Jordan stated that he did not leave the jacket on the side of the road because he noticed that Charles' car was being followed.

¶5. Jordan called Charles the next morning and again demanded that he give him $25,000 in exchange for Edwina. He assured Charles that Edwina was fine and that she was asking about the children (in addition to the three-year-old that was sleeping in the house when Jordan kidnapped Edwina, the Marters had a second son, age 10, who was at school at the time of the kidnapping). This time Charles found the jacket and left the money along the side of Interstate 10 as instructed.

¶6. When Jordan retrieved the money, two officers attempted to arrest him. A high speed chase ensued during which Jordan forced the officers' car off the road and escaped. Jordan abandoned his car in a shopping center parking lot and hid the money in the woods except for a small amount, part of which he used to purchase new clothes. Jordan changed into the new clothes and called a taxi while he was in the store. A taxi picked up Jordan and was proceeding to Jordan's announced destination when a roadblock forced it to stop. An officer working the roadblock recognized Jordan and arrested him.

¶7. Jordan confessed to the crime and told the police where to find Edwina's body, as well as the location of the murder weapon. Jordan fully cooperated with the investigating officers, showing them where he had hidden the money, his automobile, and the clothing he had worn.

¶8. A Harrison County Circuit Court jury found that Jordan was guilty of the murder and kidnapping of Edwina Marter and sentenced Jordan to death. Subsequent to the trial, in response to the Supreme Court's decision in *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), we changed the

law pertaining to death penalty proceedings and established separate trials for the guilt and sentencing phases for capital cases. *Jackson v. State*, 337 So. 2d 1242 (Miss. 1976).

¶9. Jordan was retried in 1977 in accordance with *Jackson* and was again convicted of capital murder and sentenced to death. Jordan's conviction and sentence was affirmed by this Court in *Jordan v. State*, 365 So. 2d 1198 (Miss. 1978), *cert. denied,* 444 U.S. 885, 100 S. Ct. 175, 62 L. Ed. 2d 114 (1979). *See also Jordan v. State*, 390 So. 2d 584 (Miss. 1980) (on petition for writ of error coram nobis).

¶10. Jordan's sentence was then vacated by the Fifth Circuit on petition for writ of habeas corpus. *Jordan v. Watkins*, 681 F.2d 1067 (5ᵗʰ Cir.), *rehearing denied sub nom. Jordan v. Thigpen*, 688 F.2d 395 (5ᵗʰ Cir. 1982). Based on *Godfrey v. Georgia*, 446 U.S. 420, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980), the Fifth Circuit denied habeas corpus relief as to Jordan's conviction but held that, although Jordan's crime was "heinous," *Jordan v. Watkins*, 681 F.2d at 1083, the instructions given to the jury failed to channel the sentencer's discretion by clear and objective standards and did not provide specific and detailed guidance. *Id.* at 1082-83. The Fifth Circuit remanded the case for a new sentencing.

¶11. At the 1983 sentencing hearing, Jordan was again sentenced to death and that sentence was affirmed by this Court on appeal. *Jordan v. State*, 464 So. 2d 475 (Miss. 1985). However, the Supreme Court vacated the sentence pursuant to its decision in *Skipper v. South Carolina*, 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986). *Jordan v. Mississippi*, 476 U.S. 1101, 106 S. Ct. 1942, 90 L. Ed. 2d 352 (1986). In *Skipper*, the Supreme Court reversed a sentence of death because the defendant had not been allowed to present evidence of good behavior during the term of his incarceration, which the Supreme Court considered to be relevant, mitigating evidence. *Skipper*, 476 U.S. at 3-4, 106 S. Ct. at 1670, 90 L. Ed. 2d at 5-7. On remand, Jordan entered into an agreement with the State whereby he would forego another sentencing trial and accept the sentence of life imprisonment without the possibility of parole.

¶12. In 1994, we ruled that sentencing a capital murder defendant to life imprisonment without eligibility for parole was not an option under then Miss. Code Ann. § 97-3-21 (1987). *Lanier v. State*, 635 So. 2d 813 (Miss. 1994). Because Jordan was a capital murder defendant and he was sentenced to life imprisonment without eligibility for parole, his sentence was therefore illegal under *Lanier*. After he filed a motion for post-conviction relief, we reversed and remanded for yet another sentencing trial. *Jordan v. State*, No. 95-KP-00113-SCT (Miss., Aug. 7, 1997).

¶13. At this latest sentencing trial which began April 20, 1998, Jordan offered testimony that he was a loving father and son, had a good reputation, and had served his country in Vietnam. Jordan attempted to show that he was a contributing member of society by offering evidence that he had developed an alternative method of energy production, and had authored several short stories. Several prison officials also testified that Jordan was well-mannered, had caused no problems during his 22 years at Parchman, and had even earned trusty status for his good behavior earned while he was serving his sentence of life without parole from 1991 to 1998. Witnesses further testified that he was a hard worker, and had even volunteered to work extra hours, contributing to his upkeep at the penitentiary.

¶14. The State theorized that Jordan was a con man who only did what he could to further his own selfish interest and that all of Jordan's "good deeds" were calculated to make him look good to the jury. The State argued that Jordan was a man who was taking advantage of the system and enjoying privileges through his trusty status that he did not deserve after the crimes that he had committed.

¶15. Jordan was resentenced to suffer the penalty of death with final judgment entered on April 24, 1998. This appeal arises from that sentence.

## ANALYSIS

### I. DID THE TRIAL COURT PROPERLY DENY JORDAN'S MOTION FOR SENTENCE TO LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE UNDER THE RECENTLY AMENDED MISS. CODE ANN. § 97-3-21 AND 99-19-101?

¶16. Joe Sam Owen has served as prosecutor in all of the numerous trials and resentencings in this case since the original 1976 trial. In 1976 and 1977 he served as Assistant District Attorney under then District Attorney Albert Necaise, and after he left the District Attorney's Office, he was appointed either special prosecutor or Special Assistant Attorney General to prosecute Jordan's case.

¶17. On December 2, 1991, Owen entered into an agreement with Jordan whereby Jordan would be sentenced to life imprisonment without the possibility of parole so that he would avoid a possible imposition of another death penalty. Jordan also agreed not to institute any proceedings to set aside, vacate or modify the sentence. During the sentencing hearing, Jordan stated that he understood that he was giving up the right to seek to be released on parole. The circuit court found that Jordan had knowingly, voluntarily and intelligently entered into the agreement and sentenced Jordan to life imprisonment without the possibility of parole.

¶18. Jordan filed a motion to correct or amend the sentencing order pursuant to a change of law and asked that his sentence be amended to strike the agreement regarding "without the possibility of parole." After a hearing, the circuit court denied Jordan's motion. Jordan then filed a motion for post-conviction relief to amend or correct the sentencing order. In setting aside the order, we held:

> [T]his case must be reversed and remanded because the contract in the case *sub judice* is void, even though . . . Jordan entered into the agreement knowingly, voluntarily and intelligently. The agreement providing for life without the possibility of parole was not a permissible sentencing option . . ., thus the circuit court had no authority to issue such a sentence. Additionally, the agreement is void as against public policy . . . .

> . . . Jordan is not entitled to have his sentence amended by granting him life imprisonment and deleting language denying him parole. [Citations omitted.] On remand, . . . Jordan has the right to be sentenced by a jury, and the State has the right to seek the death penalty.

*Jordan v. State*, No. 95-KP-00113-SCT (Miss. August 7, 1997). Jordan has not challenged this ruling in any way. On remand, the death penalty was imposed once more.

¶19. Prior to the sentencing trial Jordan informed Owen that he was willing to waive any ex post facto challenges he might have and to be sentenced to life imprisonment without parole. Owen declined Jordan's offer and indicated that he would not make a plea agreement with Jordan since Jordan had previously violated his agreement with the State that he would not appeal his plea and sentence of life imprisonment without the possibility of parole. Jordan then filed a motion for the imposition of a sentence of life imprisonment without parole, claiming that Owen's refusal to agree to Jordan's offer was the result of "sheer prosecutorial vindictiveness." The motion was denied without an evidentiary hearing.

¶20. On appeal, Jordan claims that the State's position chilled his constitutional right to appeal and:

[Owen's refusal to agree to Jordan's offer,] particularly in light of the fact that Mr. Jordan has been a model prisoner, can only be interpreted as prosecutorial vindictiveness and as punishment of Mr. Jordan for exercising his constitutional and statutory right to appeal the legality of a portion of his prior life sentence.

In filing the Motion, Mr. Jordan was merely exercising his constitutional and statutory right to challenge his illegal sentence. [Footnote omitted.] Accordingly, under due process, there was a rebutta[ble] presumption that the special prosecutor's refusal to agree to a sentence of life imprisonment without possibility of parole violated Mr. Jordan's constitutional rights. In the court below, the special prosecutor made no attempt whatsoever to overcome this rebuttable presumption. Thus, this case must be reversed.

¶21. Jordan cites the cases of *North Carolina v. Pearce*, 395 U.S. 711, 726, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969), and *Blackledge v. Perry*, 417 U.S. 21, 94 S. Ct. 2098, 40 L. Ed. 2d 628 (1974), in support of his claims. Pearce was convicted of assault with intent to commit rape and was sentenced to 12 to 15 years imprisonment. Several years later he initiated a post-conviction proceeding based on the unconstitutional admission of an involuntary confession. After the conviction was reversed, he was retried and once again convicted. The judge sentenced Pearce to an eight year prison term, which, when added to the time Pearce had already spent in prison, amounted to a longer total sentence than that originally imposed. The Supreme Court held that when the original conviction was set aside because of a constitutional error (in Pearce's case, the admission of an involuntary confession), the imposition of a longer sentence penalizes those who choose to exercise their constitutional rights. *Pearce*, 395 U.S. at 724, 89 S. Ct. at 2080, 23 L. Ed. 2d at 668-69. The Supreme Court went on to hold that if the first conviction was set aside for a nonconstitutional error, the imposition of a longer sentence would be no less a violation of law. *Id.* at 724, 89 S. Ct. at 2080, 23 L. Ed. 2d at 668-69.

¶22. Blackledge was convicted of misdemeanor assault with a deadly weapon. On appeal, he received a trial de novo, but the prosecutor indicted him for felony assault with a deadly weapon with intent to kill and inflict serious bodily injury, based upon the same conduct.

¶23. The Supreme Court held that a person convicted of an offense is entitled to "exercise his statutory right" to appeal and ask for a new trial without apprehension that the prosecution will retaliate by substituting a more serious charge for the original one, thereby subjecting him to a significantly increased potential period of incarceration. *Blackledge*, 417 U.S. at 28, 94 S. Ct. at 2102-03, 40 L. Ed. 2d at 634-35.

¶24. We find that Jordan's claim of prosecutorial vindictiveness is without merit for four reasons: First, Jordan neither filed a motion for rehearing nor collaterally attacked our 1997 ruling that the life imprisonment deal Jordan made with Owen was void and that, upon remand, the State could seek the death penalty. Therefore, the 1997 ruling is unassailed, and Jordan's claim of prosecutorial vindictiveness is barred by res judicata. Second, it was **this** Court which **authorized** Owen to seek the death penalty upon resentencing. Therefore, the enhancement of the sentence was attributable to our independent assessment of the suitable penalty, not to prosecutorial vindictiveness. *See Myers v. Mississippi State Bar*, 480 So. 2d 1080, 1090 (Miss. 1985). Third, the Supreme Court, in *Alabama v. Smith*, 490 U.S. 794, 795, 109 S. Ct. 2201, 2203, 104 L. Ed. 2d 865 (1989), narrowed *Pearce*'s holding, finding that the presumption of prosecutorial

vindictiveness does not apply when a sentence imposed after trial is greater than that previously imposed after a guilty plea.

¶25. Finally, even though Owen chose to seek the death penalty, the imposition of the death penalty was not in Owen's hands -- it was in the hands of the jury, which had strict guidelines to follow before it could impose the death penalty. Each aggravating circumstance had to be proven beyond reasonable doubt, and the jury was required to weigh the aggravating circumstances against the mitigating circumstances. The jury was not informed as to the long rocky road of Jordan's trials, retrials and resentencings. Therefore, any possible prosecutorial vindictiveness that Owen had as the result of Jordan's obtaining yet another resentencing was rendered impotent because it was the jury which decided that Jordan should be sentenced to death rather than life imprisonment without parole. The statutory safeguards in place in capital cases assured that the jury operated without the taint of prosecutorial vindictiveness. *See Chaffin v. Stynchcombe*, 412 U.S. 17, 93 S. Ct. 1977, 36 L. Ed. 2d 714 (1973) (The potential for vindictiveness in a sentencing process by the jury is de minimis in a properly controlled retrial.").

¶26. This claim is therefore without merit.

## II. DID THE TRIAL COURT COMMIT NUMEROUS REVERSIBLE ERRORS PERTAINING TO THE "ESPECIALLY HEINOUS" AGGRAVATOR?

¶27. Preliminarily, we find that all of the issues raised concerning the heinous, atrocious, and cruel aggravator instructions are procedurally barred. Jordan did not raise a contemporaneous objection at trial even though all of Jordan's stated reasons for objection were available to Jordan at the time the instruction was proposed.

¶28. Jordan argues that we will overlook a procedural bar where there are matters of fundamental constitutional significance at stake. "When the circuit court grants instructions clearly erroneous and which deny the accused a fair and objective evaluation of the evidence by the jury, we will reverse, even though there was no objection by defense counsel." *Duvall v. State*, 634 So. 2d 524, 526 (Miss. 1994). *See also Booker v. State*, 699 So. 2d 132, 135 (Miss. 1997) (citing line of cases excepting from procedural bars issues concerning limiting instructions concerning the heinous, atrocious, and cruel aggravator). Out of an abundance of caution, we will address Jordan's claim on the merits.

> *A. Did the trial court err in instructing the jury on the State's theory as to why the offense was especially heinous, atrocious, and cruel?*

¶29. Jordan argues that Sentencing Instruction No. 1 was erroneous because it unfairly favored the State's theory of the case. The instruction reads in part as follows:

> Whether Richard Jordan committed a capital offense which was especially heinous, atrocious and cruel and whether the murder was conscienceless or pitiless. In support of this circumstance, the State claims that Edwina Marter was murdered in execution style and that she was subjected to extreme mental torture caused by her abduction from the home wherein she was forced to abandon her unattended three year old child and removed to a wooded area at which time she was shot in the back of the head by Jordan. . . .

¶30. We note that the defense did not offer an alternative instruction or request that Instruction No. 1 be modified to include Jordan's theory of the case -- that the killing was accidental because Edwina tried to

escape and Jordan attempted to fire a warning shot over her head. Instead, the defense offered, and the court gave, an instruction which outlined the mitigating factors the jury should consider. Trial strategy is a better reason Jordan chose not to attempt to put "his" theory in writing in Instruction No. 1. To say that Jordan exercised compassion by leaving a three-year-old unattended in the Marter home or that by shooting Edwina only once in the back of the head defies logic.

¶31. Regardless, the State certainly had every right to offer an instruction which outlined its theory of the case. The instruction complained of by Jordan was fairly supported by the evidence and was properly given. *See Wall v. State*, 718 So. 2d 1107, 1111 (Miss. 1998).

> *B. Did the trial court err in accepting the jury verdict, which set forth verbatim the jury instruction on the State's "theory" of the case?*

¶32. Jordan contends that the jury verdict, which followed the above instruction verbatim, was not responsive to the jury instructions and offered no assurance that the jury had found the elements of heinous, atrocious and cruel beyond a reasonable doubt. Jordan cites authority which states that the jury verdict must be clear and unambiguous, especially in a capital murder case. *United States v. Morris*, 612 F. 2d 483, 490 (10th Cir. 1979); *United States v. Lee*, 532 F. 2d 911, 913 (3rd Cir. 1976); *Cook v. United States*, 379 F. 2d 966, 968 (5th Cir. 1967); *Duggan v. State*, 256 So. 2d 511 (Miss. 1972); *Owens v. State*, 82 Miss. 18, 33 So. 718, 720 (1903). He argues that the jury's verdict was not clear and unambiguous since the jury did not say that it had found beyond a reasonable doubt that the State had proved the theory contained in the instruction made the crime committed especially heinous, atrocious and cruel.

¶33. This claim is procedurally barred since we have held that objections to the form of a verdict will be barred unless the objection is made when the verdict is returned. *Edwards v. State*, 737 So. 2d 275, 306-07 (Miss. 1999); *Smith v. State*, 729 So. 2d 1191, 1216-17 (Miss. 1998). No such objection was made.

¶34. Addressing the merits, we note that the jury verdict in this case is not in ideal form. Apparently, the jury did not take the time to reword aggravator number 3 into a responsive and affirmative statement, as opposed to a suggestion or question. However, the entire verdict leaves no doubt as to what the jury found:

> We, the jury, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of the Capital Murder.
>
> 1. That the defendant actually killed Edwina Marter.
>
> Next, we the jury, unanimously find that the aggravating circumstances of:
>
> 1. Richard Jordan committed the Capital Murder while engaged in the crime of Kidnapping Edwina Marter.
>
> 2. Richard Jordan committed the Capital Murder for pecuniary gain.
>
> 3. Richard Jordan committed a Capital offense which was especially heinous, atrocious & cruel & whether the murder was conscienceless & pitiless. In support of this circumstance the State claims that Edwina Marter was murdered in execution style & that she was subjected to extreme mental

torture caused by her abduction from the home wherein she was forced to abandon her unattended three year old child & removed to a wooded area at which time she was shot in the back of the head by Jordan.

exist beyond a reasonable doubt & are sufficient to us to impose the death penalty and that there are insufficient mitigating circumstances to out weigh the aggravating circumstances and we further find unanimously that the defendant should suffer death.

¶35. A fair reading of the verdict convinces us that the jury's decision is unambiguous and Jordan's claim is without merit. *See, e.g.,* **Wilson v. State**, 197 Miss. 17, 20, 19 So. 2d 475 (1944) ("Ordinarily, [a] verdict is sufficient in form if it expresses the intent of the jury so that the court can understand it.").

*C. Whether the trial court's limiting instructions, both individually and in combination were unconstitutionally vague and overbroad?*

¶36. Jordan submits that Instruction No. 1, when considered in combination with No. 2, was vague and that no reasonable juror could have comprehended meaningful limitations in the instructions. Instruction No. 2 provided:

In considering whether the capital offense was especially heinous, atrocious or cruel, you are instructed that heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of, the suffering of others.

An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders -- the conscienceless or pitiless crime which is unnecessarily tortuous to the victim. If you find from the evidence beyond a reasonable doubt that Richard Jordan utilized a method of killing that inflicted physical or mental pain upon Edwina Marter before her death, that there was mental torture and aggravation before death, then you may find this aggravating circumstance exist.

¶37. Jordan argues that Instructions No. 1 and No. 2 are conflicting, since No. 1 instructs the jury that it can find that the crime was "especially heinous" since Edwina Marter was murdered in "execution style," while No. 2 instructs that the crime had to be unnecessarily tortuous, and that the victim suffered mental or physical pain. Specifically, Jordan asserts that a shooting which occurred in "execution style" (i.e., in the back of the head) is the least tortuous method of killing, and, therefore, he contends that Instructions No. 1 and No. 2 are conflicting.

¶38. Instruction No. 1 does state that the jury could find that the crime was especially heinous because Edwina was murdered in execution style, but it goes on to say, "*and* that she was subjected to extreme mental torture caused by her abduction from the home wherein she was forced to abandon her unattended three year old child and removed to a wooded area at which time she was shot in the back of the head by Jordan." Today we will not decide whether a straightforward execution style killing, without more, constitutes "heinous atrocious or cruel," but we do find that the execution style killing, in addition to the circumstances listed above, did constitute "heinous, atrocious or cruel."

¶39. We have approved of Instruction No. 2 as a proper limiting instruction concerning the "especially heinous" aggravator. *See, e.g.,* **Edwards v. State**, 737 So. 2d 275, 315 (Miss. 1999)*; **Puckett v. State**,*

737 So. 2d 322, 359-61 (Miss. 1999). Therefore, Jordan's claim is without merit.

### D. Did the "especially heinous" aggravator "double up" with the kidnapping aggravator?

¶40. Jordan argues that the "especially heinous" instruction as given in Instruction No. 1 impermissibly "doubles up" with the kidnapping aggravator since the same action is used to support both aggravating factors. In *Willie v. State*, 585 So. 2d 660, 681 (Miss. 1991), and again in *Davis v. State*, 660 So. 2d 1228 (Miss. 1995), we held that the State could not use one event or circumstance to support two separate aggravators as that would allow the jury to weigh doubly that circumstance. In *Willie*, Justice Sullivan, writing for the Court, stated that pecuniary gain and robbery aggravating circumstances should not be given as separate and independent aggravators. We reasoned that those aggravators essentially comprised one circumstance.

¶41. The two aggravating factors of kidnapping and heinousness are not "doubled up" in the case at hand. Jordan could have kidnapped Edwina without the crime being heinous. He could have allowed Edwina to secure the safety of her child. He did not have to kill her in the cold and inhumane way he did. After he received his ransom, he could have returned her to her family, physically unharmed. This claim is without merit.

### E. Was there insufficient evidence for a juror to find that the offense was especially heinous, atrocious or cruel?

¶42. Jordan argues that this crime could not be found to be especially heinous under any reading of the facts since he avers that Edwina Marter was not unnecessarily tortured, either physically or mentally. As stated above, we have previously ruled otherwise. In *Jordan v. State*, 464 So. 2d 475, 477-78 (Miss. 1985), *vacated on other grounds*, 476 U.S. 1101, 106 S. Ct. 1942, 90 L. Ed. 2d 352 (1986), we held that there were sufficient facts to warrant a jury determination as to whether this crime was especially heinous, atrocious or cruel. Moreover, the Fifth Circuit stated that Jordan's crime was "heinous." *Jordan v. Watkins*, 681 F.2d at 1083. Therefore, this argument is without merit.

### F. Did the use of the "especially heinous" aggravator violate ex post facto and due process considerations?

¶43. Jordan's ex post facto challenge to the use of aggravating factors in trying this case has already been addressed and denied by this Court. *Jordan v. State*, 464 So. 2d 475 (Miss. 1985). Also, as Jordan himself points out, this same issue has been addressed and denied by the Fifth Circuit. *Jordan v. Watkins*, 681 F.2d at 1079. Therefore, this issue is without merit.

¶44. Jordan also alleges that use of the "especially heinous" aggravator by the prosecution was in violation of his right to due process. Specifically, Jordan alleges he was not adequately notified by the prosecution of its intent to use the "especially heinous" instruction or the proof the prosecution would submit in support thereof. Jordan's assertions are belied by the record. The prosecution supplied Jordan both a written response to his motion concerning this same issue and relayed that same information to defense counsel verbally at the motion hearing. This issue is without merit.

### III. WAS JORDAN DENIED HIS RIGHT TO A MEANINGFUL APPEAL?

¶45. Jordan claims that he has been denied his constitutional right to an appeal in this case because the

record is incomplete. Jordan made a pre-trial motion that was consented to by the State that all trial proceedings, including voir dire and bench conferences, be transcribed for his benefit on appeal. Jordan points out that portions of the record are incomplete, and the record does not contain all of the statements uttered in the courtroom during the sentencing trial, making it impossible for Jordan to ascertain if errors for appeal were contained within those portions of the trial.

¶46. The State alleges that those portions of the trial that Jordan says were not transcribed were, for the most part, administrative matters. The State attempts to show that Jordan can ascertain the content of the missing pieces by context from the rest of the record and that, therefore, he has not been denied a meaningful appeal.

¶47. In **Burns v. State**, 729 So. 2d 203, 211-12 (Miss. 1998), we stated, "When a trial judge grants a motion to have all proceedings recorded, it becomes at least partially the responsibility of the granting court to do everything possible to ensure the court reporter complies with the order." We did not overrule case law making it the responsibility of the criminal defendant/appellant to ensure that there is record for the appeal, but we did "admonish the trial courts of our State to assist in the endeavor."

¶48. In **Watts v. State**, 717 So. 2d 314, 316-18 (Miss. 1998), which was decided shortly before **Burns**, we placed the responsibility on the criminal defendant to prove how he might have been prejudiced by the missing portions of the trial transcript. *Accord*, **United States v. Taylor**, 607 F.2d 153 (5th Cir. 1979). In **Watts**, as here, the same counsel represented the criminal defendant at trial and on appeal. We reasoned that the same counsel who represented Watts on his appeal was present at trial when the proceedings occurred and found that it was the responsibility of the appellant to provide an accurate account of the proceedings in accordance with Rule 10(c) of the Mississippi Rules of Appellate Procedure. Therefore, an appellant must demonstrate or claim error in the proceedings and record same to the best of his recollection in order to create reversible error.

¶49. We find that the possibility of the missing portions of the transcript contained reversible error is highly unlikely. And, even though it is the responsibility of a judge to insure that the transcript is complete, *see* **Burns v. State**, 729 So. 2d at 211-212 ("When a trial judge grants a motion to have all proceedings recorded, it becomes at least partially the responsibility of the granting court to do everything possible to ensure the court reporter complies with the order."), this fact does not acquit the defense from also making sure that all proceedings are transcribed.

¶50. This claim is without merit.

### IV. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR CONCERNING THE REPORTS OF THE DEFENDANT'S PSYCHIATRISTS?

¶51. At a pre-trial telephonic conference, Jordan requested appointment of a psychiatrist to explore possible mental health issues as mitigating factors in his defense. The trial court, over defense objection, ordered that a copy of the report be provided to the prosecution. Dr. Maggio concluded that Jordan had an antisocial personality disorder. Specifically, Dr. Maggio referenced a 1976 report generated by another psychiatrist, Clifton Davis, M.D.,[2] who had been asked to determine Jordan's competency to stand trial in 1976. Dr. Maggio relied on Dr. Davis' report as follows:

Review of the previous intake interview and psychiatric evaluation reveals a consistency of some of

the history; however, there are moments of inconsistency in which Mr. Jordan previously acknowledged that he had always been a good con man. He had done a number of illegal activities but had not been caught except on one or two occasions; that he had been fired or asked to resign because of embezzlement if [sic] $43,000.00; that while he was under financial pressures he wrote bad checks and then was searching for a way for quick money at which he considered bank robbery with kidnaping [sic] and extortion and had worked out the plan himself. He then readily blames the F.B.I. more or less for the woman's death shrugging it off by saying "better luck next time." He apparently displayed little remorse, held the F.B.I. responsible, no overt sadness. The review also shows that he joined the Army in 1964 and had been charged with check forgery and agreed to join the Army so the charges would be dropped. He was also court martialed [sic] in 1970 for falsification of official documents and sentenced to 9 months in Levenworth. He received a Dishonorable Discharge from the Army in 1971. All of this is in contrast and contradiction to what he told me when he denied having any difficulty with authority figures, having an Honorable Discharge from the military and being a good guy prior to this murder and has been a good guy since then while he's been in prison.

¶52. In his report (which was never admitted into evidence), Dr. Maggio concluded that Jordan's antisocial personality disorder manifested itself in a failure to conform to social norms with respect to lawful behavior, deceitfulness and conning others for personal pleasure or profit, impulsivity, irritability and aggressiveness, reckless disregard for the safety of others, irresponsibility in failure to maintain consistent work behavior and honor financial obligations, and lack of remorse for his behavior.

¶53. Jordan alleges that he had no intention of offering the expert testimony of Dr. Maggio, and that, therefore, it was error for the trial judge to order that a copy of Dr. Maggio's report be given to the prosecution. Jordan relies on Rule 9.04 of the Mississippi Uniform Circuit and County Court Rules, which provides that the prosecution should be provided with any expert reports that the defendant "may offer into evidence." The State contends that, when the order was made by the trial judge, Jordan's clear intention was to use the psychiatric evaluation as mitigation evidence.

¶54. Even though Jordan claims his right to due process was violated, the issue, at its basis, implicates the Fifth Amendment to the United States Constitution, the guarantee against self-incrimination. Jordan did not want the State to have copies of the psychiatric reports because they included statements made by Jordan and opinions based thereon which may have been damaging to his defense. Therefore, if it is determined that Jordan's Fifth Amendment rights were not violated, he has no due process claim.

¶55. A short synopsis of relevant cases is helpful. First, in **_Mitchell v. United States_**, 526 U.S. 314, 324, 326, 329, 119 S. Ct. 1307, 1313, 1314, 1315, 143 L. Ed. 2d 424 (1999), the Supreme Court held that the Fifth Amendment remains in full force and effect during sentencing proceedings even though a defendant's guilt has been adjudicated or a plea of guilty has been entered.

¶56. The Supreme Court has also held that a capital defendant's Fifth Amendment rights were violated when a state psychiatrist testified that, based on statements made at a competency hearing ordered by the court sua sponte, the defendant was a severe sociopath whose condition could not be remedied: "The essence of this basic constitutional principle is the requirement that the State which proposes to convict and punish an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." **_Estelle v. Smith_**, 451 U.S. 454, 462, 101 S. Ct.

1866, 1872, 68 L. Ed. 2d 359, 368 (1981). The basis of Jordan's claim is that the psychiatrist formed opinions harmful to Jordan's case from Jordan's statements, in effect, forcing incriminating words from Jordan's own lips.

¶57. *Estelle* deals with a court-ordered mental examination. However, in Jordan's case, the *defense* requested that a court-appointed psychiatrist examine Jordan, and Jordan voluntarily subjected himself to a mental examination. In *Buchanan v. Kentucky*, 483 U.S. 402, 422-23, 107 S. Ct. 2906, 2917-18, 97 L. Ed. 2d 336, 355 (1987), the *defendant* requested a psychological examination. At trial, he attempted to substantiate his defense of "extreme emotional disturbance" by having a social worker read excerpts from reports of his psychological examination. In response, the State requested the social worker read from other psychological reports which reflected the defendant's composed, manipulative character. The Supreme Court held that the defendant's Fifth Amendment rights were not violated: "[I]f a defendant requests such an evaluation or presents psychological evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested."

¶58. In *Schneider v. Lynaugh*, 835 F.2d 570 (5th Cir. 1988), Schneider's counsel moved for a psychiatric examination to determine whether Schneider was fit to stand trial. A psychiatrist subsequently determined that Schneider was sane and competent to stand trial. At the sentencing phase, Schneider presented three witnesses -- a drug abuse counselor, an employee in the jail's rehabilitation program, and a jail chaplain -- to demonstrate his sincere desire to overcome his drug addiction. Cross examination of these witnesses revealed that their opinions were based solely on what Schneider had told them. None of the witnesses conducted any type of psychological exam or background behavioral study. In response, the State called a psychiatrist who had previously examined Schneider. The psychiatrist testified that Schneider had a "sociopathic personality disorder," no feelings of guilt or remorse, and no prospect of rehabilitation.

¶59. In a petition for writ of habeas corpus, Schneider claimed that the psychiatrist's rebuttal testimony violated his Fifth Amendment right against self-incrimination. The Fifth Circuit held, "[T]he defendant must introduce mental-status evidence that may fairly be characterized as expert before the prosecution may respond with the results of a psychiatric examination." However, Schneider's three witnesses, although not formally qualified as expert, had experienced backgrounds in assessing drug users' propensity to reform. Also, the issue at hand -- the probability of reformation -- could be determined without highly specialized knowledge. The Fifth Circuit therefore held that Schneider had "introduce[d] mental-status evidence that may fairly be characterized as expert." *Id.* at 576.

¶60. In *Brown v. Butler*, 876 F.2d 427 (5th Cir. 1989), the Fifth Circuit ruled that the State's use on rebuttal of a criminal defendant's non-Mirandized statements to a forensic psychiatrist who examined the defendant pursuant to a court order violated the defendant's constitutional privilege against compelled self-incrimination. The defendant's defense was insanity, and, in his case-in-chief, the defendant attempted to prove his insanity through the observations of three witnesses -- two jailers and a physician. The State put the forensic psychiatrist on as rebuttal to the defendant's three witnesses' testimony. The Fifth Circuit held that the two jailers' testimony could "be readily dismissed as a source of expert mental-status evidence." The jailers appeared "to have no more knowledge than lay witnesses on the highly technical and elusive subjects of psychology and psychiatry." The physician's testimony related solely to his treatment of the defendant's seizures based on the jailers' lay description of Brown's symptoms. He did not attempt to suggest that the seizures reflected a psychotic condition. The Fifth Circuit held that the doctor's testimony was not so technical as to warrant the State's use of overwhelmingly more specialized testimony from a psychiatrist and

could not be characterized as expert mental-status evidence. Such rebuttal evidence violated the defendant's Fifth Amendment right against self-incrimination.

¶61. However, the Fifth Circuit held that the constitutional violation was harmless error. If the prosecution can prove beyond a reasonable doubt that a constitutional error did not contribute to the verdict, the error was harmless and the verdict may stand. ***Chapman v. California***, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705 (1967). Brown did not seriously contest the fact that he committed the acts underlying the armed robbery charge and, instead, presented a defense of insanity. The Fifth Circuit stated that, because he failed to prove a necessary element of the insanity defense, the constitutional error was harmless.

¶62. And finally, we, in ***Willie v. State***, 585 So. 2d at 678, held that if a defendant does not raise his sanity as a mitigating factor, a state psychiatrist should not be allowed to testify. But, because the defendant did proffer evidence showing that he had family members who had some mental instability and that he had socialization problems, we deferred to the trial court's discretion in allowing the psychiatrist to give her opinion that the defendant was not psychotic.

¶63. In the case at bar, during the sentencing hearing, Jordan called as a character witness Richard Luther King, a telephone company employee who, after retirement, worked as a security guard and telecommunications assistant at Mississippi College. King testified that he had known Jordan since he was a child. He lost contact with Jordan after graduation from high school, but he began to visit Jordan at Parchman once or twice a month in 1982. They also wrote each other and talked on the telephone. Sometimes he took his wife and three children to visit Jordan. Jordan helped his two older children with school work. He stated:

> In my heart I don't feel like the man would be a danger to anybody anywhere for anything. I don't. If the man was out he would be welcomed in my house. If there's anything that I can do to help him or if he could help me I think he would. The man, to my knowledge, has not done anything at Parchman that has been derogatory or detrimental or out of the way. He's not been in trouble. His attitude to me is a lot better than mine would be. He accepts that he's there. I think I would be frustrated, but I've never seen him frustrated. I've never heard him say a cuss word. He doesn't smoke, you know. So I think he would be -- he's okay. I don't see anything would be detrimental anywhere. I just don't see it.

¶64. On cross-examination, the State asked King if he knew that Jordan blamed the FBI for the victim's death; if King knew that Jordan said that he was sorry that the victim was killed, but then he shrugged his shoulders and said, "Better luck next time"; if he knew why Jordan entered the military, why he was discharged from the military, and why Jordan left his employment with the fertilizer company in Louisiana; and if King considered Jordan to be a danger to others. The basis of the State's questions was Dr. Davis' psychiatric report which was introduced into evidence when Dr. Davis testified during the guilt phase. *See* ***Jordan v. State***, 365 So. 2d 1998, 1203 (Miss. 1978). The report was marked for identification purposes only during a hearing on Jordan's motion in limine held on April 22, 1998. The report, which was never introduced into evidence at trial or read to the jury during the sentencing trial sub judice, indicated that the reason Jordan left the fertilizer plant was because he embezzled some of the company's funds; the reason Jordan joined the military was to avoid prosecution for embezzlement, and that he was dishonorably discharged from the military. Jordan made the statements concerning the killing during the examination. The State asked King to read parts of the psychiatric report before he responded to the questions. King stated that he had no knowledge of these incidents.

¶65. In *Harris v. State*, 777 P.2d 1359, 1362 (Okla. 1989), Harris' special education teacher testified as a character and an expert witness, opining that Harris was psychologically incapable of committing the crimes charged. On cross-examination, the prosecutor sought to impeach her testimony by using an evaluation of Harris prepared by a clinical psychologist. Upon objection, the court permitted the witness to read silently that part of the evaluation which contradicted her testimony. Cross-examination based upon the report was allowed when its substantive contents were not revealed to the jury. Harris argued that the trial court's ruling improperly admitted hearsay and was prejudicial.

¶66. The Oklahoma Supreme Court held that cross-examination was permissible into matters affecting the credibility of the witness:

> The trial court should allow cross-examination into matters which tend to explain, contradict, or discredit any testimony given by a witness or which tests his accuracy, memory, veracity or credibility." The prosecutor used the psychological evaluation to cross-examine and contradict Ms. Brock as to the extent of appellant's mental capacity to commit the crime. Since the trial court ruled the substantive contents of the psychological evaluation were not to be disclosed to the jury and limited its use to impeachment of the witness, we find no error.

*Id.* at 1362 (citations omitted).

¶67. We find that the State's cross-examination of King did not violate Jordan's privilege against self-incrimination. King testified that he had known Jordan most of his life; therefore it was reasonable for the State to ask King about Jordan's employment and his military career. King testified that he did not consider Jordan to be dangerous and that he had exhibited good behavior during his tenure at Parchman; therefore it was reasonable for the State to ask King about statements made by Jordan about the killing. Moreover, as in *Harris*, King merely silently read the psychiatric report and the jury was not apprized of the substantive contents of the report.

¶68. This issue is without merit.

### V. DID THE SPECIAL PROSECUTOR IN THIS CASE HAVE AUTHORITY TO ACT ON BEHALF OF THE STATE, AND WERE ANY OF JORDAN'S RIGHTS AFFECTED BY HIS PROSECUTION BY THE SPECIAL PROSECUTOR?

¶69. Jordan charges the trial court erred in failing to disqualify Joe Sam Owen as the special prosecutor on three bases: First, Jordan contends that the State failed to show a need for appointment of a special prosecutor, and should have that appointment approved by the court. Jordan relies on a 1984 Attorney General's opinion from then Attorney General Edwin Lloyd Pittman. 1984 Miss. A.G. Lexis 145, at 5 (Oct. 1984). In that opinion, the Attorney General suggested that Mississippi should follow the common law rule of allowing appointment of a special prosecutor, but that the appointment should be approved by the trial judge. Included in the record is a copy of a 1983 order appointing Owen to be a special prosecutor as well as an Oath by Owen signed by Judge Vlahos in 1989.

¶70. Secondly, Jordan complains that Owen exceeded his authority because he acted without the supervision and consent of the district attorney. Jordan believes Owen lacked objectivity and placed his personal interest in obtaining a conviction over society's interest in justice and the defendant's right to a fair trial. Specifically, Jordan points to a statement by Owen:[3]

When [Mr. Sumrall] first mentioned [a plea agreement] I told him that I would be glad to entertain it only as a courtesy to Tom, but I did let him know that I was not inclined to do that. I had some very strong feelings about this case. We've been down this road. . . .We've spent a lot of time preparing for trial, at least my office has.

¶71. Jordan alleges that the District Attorney gave Owen unfettered discretion involving plea agreements.

¶72. Third, Jordan alleges that his due process rights were violated because the State cannot prove that it had significant interests that outweighed Jordan's liberty interest in this case. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L. Ed. 2d 18 (1976).

¶73. The State contends that it does not need to demonstrate a need to appoint a special prosecutor in this case, as it has inherent statutory authority to do that. Owen was appointed by the Attorney General, and the Attorney General has unlimited discretion to appoint a special prosecutor under Miss. Code Ann. §§ 7-5-5 & -7 (1991). The State also points out that either the District Attorney or one of his assistants was present with Owen at most of the pre-trial and trial proceedings.

¶74. While Jordan presents a compelling argument about the conflicts that can arise in having an attorney who takes a personal interest in the case prosecute a criminal action, there is no limit on an Attorney General's ability to appoint same. Owen therefore acted with proper authority.

¶75. The Fifth Circuit has ruled that, where special prosecutors are appointed, district attorneys must "retain control of the prosecution." *Faulder v. Johnson*, 81 F.3d 515, 517 (5th Cir. 1996). In *Faulder*, Hill, a special prosecutor, had participated in the defendant's first trial as an assistant district attorney. The other special prosecutor, Burleson, was a former prosecutor and a well known criminal defense attorney. When the resulting conviction was overturned due to the erroneous admission of the defendant's confession, Burleson was hired by the victim's family to determine whether a second prosecution was possible without the use of the confession. The district attorney assigned an assistant with two years of experience to help Hill and Burleson during the trial. The defendant complained that the use of special prosecutors violated his constitutional rights. The Fifth Circuit held that, because of "Hill's prior relationship with the district attorney's office, the frequent communication between counsel and clear understanding of the district attorney's final decision-making authority," the district attorney controlled the defendant's prosecution.

¶76. We find that Jordan's claim must fail because he has not any proof or argument that the Harrison County District Attorney's Office did not retain control of the prosecution. As stated above, either the District Attorney himself or one of his assistants were present with Owen during most of the pre-trial hearings and at trial. There is absolutely nothing in the record on which to make an inference that Owen's prosecutorial actions were not authorized by or under the control of the District Attorney.

### VI. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR BY OVERRULING DEFENDANT'S OBJECTIONS DURING THE PROSECUTION'S CLOSING ARGUMENTS AND BY ALLOWING THE SPECIAL PROSECUTOR TO CHARACTERIZE MR. JORDAN''S MITIGATION EVIDENCE AS A REASON TO IMPOSE DEATH?

¶77. Jordan cites numerous statements made by the State during closing argument for his claim that the trial court committed reversible error by overruling his objections thereto. A review of most of these statements

reveals that no contemporaneous objection was made. In fact, during the entire closing argument, the defense objected only twice.

¶78. The first objection pertained to the following statement by the State: "Put an end to this charade. It's time for Richard Gerald Jordan and the likes of Richard Gerald Jordan to be stung ad infinitum." The defense objected on the basis that "what other people ought to get" was improper and the State should be restricted to arguments about Jordan only. The objection was sustained, and we find that this statement did not unduly prejudice the defense in any way.

¶79. The second discourse objected to by Jordan was as follows:

> BY MR. OWEN: Richard Gerald Jordan . . . has tested this system to the fullest extent. And I submit to you that he uses it, he misuse[s] it, he abuses it, and he --

> BY MR. SUMRALL: Object to that, Your Honor, there hasn't --

> BY MR. OWEN: I'm getting to the point --

> BY THE COURT: I can't hear. Hold up, Mr. Sumrall, just a minute. The young lady has to track whatever we say. Don't override each other. Make your objection and I'll rule on it.

> BY MR. SUMRALL: Yes, sir. There hasn't been any evidence about him testing the system. The only thing before this jury is his sentence today. And, Your Honor, I'm going to move for a mistrial because of that last remark.

> BY MR. OWEN: May it please the court, I didn't finish my statement.

> BY THE COURT: I understand that you didn't. Based on what's in the record and based upon the objection I will overrule the objection on the motion, and I will overrule the motion for a mistrial.

> BY MR. OWEN: Richard Jordan has tested, abused and misused the penal system in this state. He's turned it into a mockery. Trusteeship and the things that you have at Parchman have a purpose, but he's abused it and misused it in my opinion, the State of Mississippi's opinion, when a prisoner charged with this terrible crime can do the things that he's doing at Parchman and can engage in the outside activities that he's engaging in, and ladies and gentlemen of the jury you cannot say that justice is being served.

¶80. Although an objection was made at the very beginning of the remarks complained of by Jordan, the basis of the objection was that Owen's comments were not based on the evidence before the court. After Owen resumed his remarks, it was clear that he was commenting on the privileges Jordan enjoyed at the State Penitentiary at Parchman, and testimony about these privileges had been admitted into evidence by Jordan himself.

¶81. No other objection was made during the State's closing argument. Therefore, Jordan's claims pertaining to the court's failure to sustain Jordan's objections are procedurally barred. Nevertheless, in an abundance of caution, we will address the merits.[(4)]

¶82. Jordan introduced character evidence that he was a good prisoner and had caused no trouble in his 22 years at Parchman. He attained trusty status while under a sentence of life imprisonment without parole,

indicating that he was not a threat to himself or others and that he was not an escape risk.

¶83. The State used this character evidence to argue that the imposition of the death penalty was appropriate because Jordan had used and misused the system; because a person who had committed a terrible crime such as that one committed by Jordan should not be eligible for the benefits that Jordan received at Parchman; and because Jordan could use the phone, watch television, write his short stories, go to the law library, ride around on a tractor, etc., implying that Jordan was not being punished severely for his crime.

¶84. Jordan, relying upon *Zant v. Stephens*, 462 U.S. 862, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983), claims that the State unconstitutionally turned around the mitigation evidence presented by the defense and used it as evidence of aggravating circumstances. We have reviewed *Zant* and do not find much support for Jordan's claim. We quote from the opinion to put into context the portion (emphasized by bold face) relied upon by Jordan:

> Respondent contends that the death sentence was impaired because the judge instructed the jury with regard to an invalid statutory aggravating circumstance, a "substantial history of serious assaultive criminal convictions," for these instructions may have affected the jury's deliberations. In analyzing this contention it is essential to keep in mind the sense in which that aggravating circumstance is "invalid." It is not invalid because it authorizes a jury to draw adverse inferences from conduct that is constitutionally protected. Georgia has not, for example, sought to characterize the display of a red flag, the expression of unpopular political views, or the request for trial by jury, as an aggravating circumstance. **Nor has Georgia attached the "aggravating" label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the race, religion, or political affiliation of the defendant, or to conduct that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness.** If the aggravating circumstance at issue in this case had been invalid for reasons such as these, due process of law would require that the jury's decision to impose death be set aside.

*Id.* at 884-85, 103 S. Ct. at 2747, 77 L. Ed. 2d at 255 (citations omitted) (emphasis added).

¶85. *Zant* is distinguished from the case sub judice because the invalid aggravating circumstance was included in an instruction to the jury. Owen's characterization of Jordan's mitigation evidence was made in his closing remarks and was not incorporated into a jury instruction.

¶86. Nevertheless, while Owen's comments about the privileges Jordan might enjoy if he were sentenced to life imprisonment instead of subjected to the death penalty may have been improper, we find that they did not unduly prejudice the jury and that the error, if any, was harmless. The jury's verdict was amply supported by the evidence and was not the result of prejudice, bias or passion.

## VII. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR BY PERMITTING THE STATE TO ENGAGE IN REPEATED PROSECUTORIAL MISCONDUCT?

¶87. Jordan alleges in this assignment of error that it was improper for the prosecutor to refer to facts not in evidence during closing argument.[5] This assignment of error is procedurally barred inasmuch as no contemporaneous objection was made during trial. However, out of an abundance of caution, we will address the merits of Jordan's claim.

¶88. Prosecutors are allowed to make reasonable inferences from the facts in evidence. As we have stated:

> This Court has held that attorneys have a right and duty to deduce and argue reasonable conclusions based upon the evidence, which are favorable to their clients, and they may do so whether the conclusions are weak or strong so long as they are legitimate, and it is the function of the jury to determine the logic and weight of the conclusion.

*Harvey v. State*, 666 So. 2d 798, 801 (Miss. 1995).

¶89. Owen referred to Jordan as a "scam artist" and "con man." We find that Owen's characterization of Jordan was based on reasonable inferences from the evidence. Jordan's crime consisted of nothing but one big scam. He searched for an appropriate mark, Charles Marter, cased his house, and gained entry to the house under false pretenses, posing as a utility repairman. After he killed Edwina, he lied to Charles several times when he said that Edwina was alive and well and asking about how her children were.

¶90. Besides, we have approved of the State referring to the criminal defendant as "evil." *Edwards v. State*, 737 So. 2d 275, 298 (Miss. 1999). The two references Owen made were isolated incidents. We cannot say that calling Jordan a "con man" or a "scam artist" were so highly inflammatory as to unduly prejudice the jury against him.

¶91. Owen also argued that Jordan intended to shoot Edwina Marter again if she had not been dead. Jordan avers that this statement is completely unsupported by the record. As stated above, prosecutors are allowed to make reasonable inferences from the facts in evidence, and we find that Owen's statement is a reasonable inference therefrom. It is clear that Jordan carefully planned his crime before he put it into action. He played the role of a General Electric representative by wearing a coat and tie and holding a clipboard which he had purchased and altered to make him appear official. He called the bank to acquire the name of a loan officer. He found the loan officer's residence and waited until he had the opportunity to seize the loan officer's wife. He then drove her to a remote area and killed her execution style. Jordan says that he did not intend to kill her, but a reasonable inference from the facts is that he did intend to kill her. After such careful planning prior to taking action, why did he not have the materials at hand with which to secure a victim for ransom such as rope, a blindfold, food and water, a safe house, etc.? The only thing he took with him and Edwina was his gun which had two bullets in it. Jordan said he intended to tie her up with his tie, but a tie alone would not secure anyone very well. No doubt that he was planning to use his gun just like he had used every other item that he had with him in the commission of the crime. Owen argued that if the first bullet did not kill Edwina, he would have used the second bullet, but after seeing that she was dead, he did not have to use the second bullet. The second bullet was in the firing chamber when the gun was fished out of the Big Biloxi River.

¶92. Jordan alleges that it was improper for Owen to make personal references and bolster himself before the jury. Owen stated:

> I stand before you today as a special prosecutor. This is not my profession. I gain nothing from it. I profit nothing from it. I am a private practitioner. I'm not salaried by the District Attorney's office. I'm not salaried by the Attorney General. I don't get one penny. I don't want one penny. I want justice, the State of Mississippi wants justice.

> * * *

If you feel that I am harsh on Richard Gerald Jordan then I apologize. But I've been in this case a long time.

¶93. Jordan cites *United States v. Young*, 470 U.S. 1, 105 S. Ct. 1038, 1043, 84 L. Ed. 2d 1 (1985), in support of his claim of improper closing argument. While the Supreme Court did state that a prosecutor should refrain from interjecting personal beliefs into the presentation of his case, *id.* at 9, 105 S. Ct. at 1043, 84 L. Ed. 2d at 8, the main thrust of its opinion was to prohibit attorneys from "commenting on a defendant's guilt and offering their unsolicited personal views on the evidence." *Id.* Accordingly, the ABA Standards for Criminal Justice 3-5.8(b) (2d ed. 1980), states, "It is unprofessional conduct for the prosecutor to express his or personal belief or opinion as to the truth or falsity of any testimony or evidence of the guilt of the defendant." The conduct in question involved a defense counsel who personally attacked the prosecutor. Owen's comments, which consisted of a brief recitation of his personal involvement in Jordan's prosecution, did not rise to this level and did not unduly prejudice Jordan.

¶94. Finally, Jordan complains that Owen improperly argued facts which were not in evidence when Owen suggested that Jordan had financially benefitted from his time in Parchman by attempting to sell his wind tunnel and his collection of short stories. Again, a prosecutor is permitted to make reasonable inferences from the evidence. It is reasonable to state that Jordan entered into negotiations with the TVA to *sell* his wind tunnel to them, rather than to *give* it to them. In fact, Jordan hired an attorney to insure that TVA did not obtain any ownership rights to the wind tunnel, but to study the device for evaluation purposes only. The same rationale applies to his collection of short stories.

¶95. This issue is without merit.

### VIII. SHOULD VICTIM IMPACT EVIDENCE HAVE BEEN ALLOWED IN JORDAN'S SENTENCING TRIAL?

¶96. Jordan alleges that the prosecution should have been prohibited from introducing evidence of the effect that Edwina Marter's death had on her family. However, in *Wells v. State*, 698 So. 2d 497, 512-513 (Miss. 1997), we held that victim impact evidence of this sort would be allowed in the sentencing phase of a capital murder trial. Specifically, we found that the United States Supreme Court had found that victim impact statements were not constitutionally barred by the Eighth Amendment. *Id.* at 513; *see Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991). The Supreme Court stated, "'A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.'" *Wells*, 698 So. 2d at 513 (quoting *Payne*, 111 S. Ct. at 2609). Therefore, this assignment of error is without merit.

### IX. DID THE TRIAL COURT ERR IN OVERRULING JORDAN'S OBJECTION TO A VISUAL AID ALLEGEDLY SHOWING THE PATH OF THE BULLET?

¶97. Jordan alleges that it was error for the trial court to allow the prosecutor to use a visual aid during closing arguments to show that Jordan's description of how the murder occurred was incredible. Jordan alleged that Edwina was running away from him and that he had attempted to fire a warning shot, presumably above her head, but that the bullet struck and killed her. The State's theory was that Edwina had been murdered by being shot in the back of the head while kneeling on the ground in the manner of an execution.

¶98. State Exhibit 26 was a picture of a man firing a gun up into the air and a woman in a running position ahead of him. The picture showed a presumed trajectory of the bullet going up and then coming back down to enter in the lower part of the woman's head and then exit in an upward manner, as Edwina's wound occurred. Even someone without any ballistics training can see that a bullet cannot travel in the way the picture depicted.

¶99. The State contends first that there is no evidence that the visual aid was used. The record supports the State's contention because there is no indication that the picture was described or referred to in the State's closing argument.

¶100. Even if the drawing had been shown to the jury, there would be no merit in the argument. Jordan argues that the picture is unfair and misleading. We have held that a trial court should be careful in limiting the freedom of manner that counsel can use in making their arguments to a jury. *Brewer v. State*, 704 So. 2d 70, 73 (Miss. 1997). Demonstrative aids are allowed where they are based on the evidence presented. In this case, the State was properly allowed to show that Jordan's description of how the crime took place was unbelievable. On the other hand, Jordan could have easily refuted this evidence by pointing out the ludicrousness of the very same demonstrative aid. Therefore, there was no error in the trial court allowing the use of visual aid.

## X. DID THE TRIAL COURT PROPERLY ALLOW THE "EXPERT" OPINION OF THE STATE'S WITNESS DAVID MELTON?

¶101. David Melton was an investigator with the Harrison County Sheriff's Department at the time of the crime. Melton testified concerning the forensic evidence, including the position of Edwina's body, at the scene of the crime, including blood spatters and Edwina's position at the time of her death, whether she was running or stationary and whether she was kneeling or standing. Jordan objected to the testimony when it was offered at trial, contending that the State failed to qualify Melton as an expert and, therefore, he gave inadmissible opinion testimony as a lay witness. *See* M.R.E. 701.

¶102. A review of the record reveals that Melton, who had receiving training in the interpretation of blood stains, could opine with authority about the blood found at the scene of the crime, but he had no training in other areas of forensic pathology, such as using the position of a victim's body to determine what happened when the victim was killed. Melton testified that he was employed by the Gulfport Police Department from 1966-1969 and by the Harrison County Sheriff's Department from 1972-1977. He attended the Mississippi State Law Enforcement Training Academy and received training in fingerprints and blood stains.

¶103. However, Dr. William D. Atchison, a qualified forensic psychologist, testified as to whether Edwina was kneeling or standing or running or stationary. Therefore, if allowing Melton to testify as to the position of the body was error, it was harmless error. This issue is without merit.

## XI. DID THE TRIAL COURT PROPERLY SUSTAIN OBJECTIONS BY THE STATE CONCERNING JORDAN'S CROSS-EXAMINATION OF THE STATE'S PATHOLOGIST?

¶104. After the State's pathologist testified about the trajectory of the bullet, Jordan's counsel attempted to pose a hypothetical question as follows:

Let me just give you a hypothetical case. Let's assume that a person is standing on the side of the hill . . . and another person is running away from them and they are in a crouched position going say up a hill, would you rule out the possibility that a trajectory could have made the same path in the skull as we have in this case?

¶105. After the State objected, the trial judge ruled that the hypothetical must conform to the proof that was already in the record. *See Lester v. State*, 692 So. 2d 755, 776 (Miss. 1997). There was no proof in the record that would support that Jordan was in a "crouched position." Therefore, the trial judge's ruling on this issue is not erroneous. Jordan could have rectified the situation by asking the same hypothetical without references to crouching or by requesting that the State specify what parts of the hypothetical did not conform to the record.

¶106. In addition, any possible error was harmless since the State's pathologist admitted on cross-examination that Jordan's theory was within "a rare degree of probability." While the pathologist did not enthusiastically support Jordan's theory, he did not exactly rule the theory out either. Therefore, this issue is without merit.

### XII. DID THE STATE'S PATHOLOGIST PROPERLY OFFER AN OPINION AS TO THE POSITION OF THE VICTIM'S BODY WHEN SHE WAS SHOT?

¶107. This issue is procedurally barred since Jordan failed to raise a contemporaneous objection to the testimony of William D. Atchison, M. D., a forensic pathologist. *See Williams v. State*, 684 So. 2d 1179, 1203 (Miss. 1996). Notwithstanding the procedural bar, the issue is without merit.

¶108. After Jordan stipulated to Dr. Atchison's qualifications, Dr. Atchison testified that he performed an autopsy on Edwina's body. Edwina died of a gunshot wound which entered the right occipital skull and exited the left frontal bone above the left eye. The bullet traveled on an upward path, from right to left and from back to front. An examination of the back of the head showed no singing of the hair. The skin on the edges of the wound were slightly discolored. The wound was not a contact wound, but it was a "near wound" with a distinct abrasion. Exhibit 28, a photograph of the back of the head, showed the dark ring around the wound. It was not a "far wound." A microscopic examination of the wound showed bone fragments and powder residue. His opinion, in terms of "reasonable medical probability," was that the bullet was fired within "a matter of inches and possibly two feet, 30 inches, in that realm of distance;" and that Edwina was in a stationary position on her knees when the gun was fired.

¶109. Jordan first states that Dr. Atchison's testimony should not have been allowed since he failed to state that his opinion was within "a reasonable degree of medical certainty." *See Catchings v. State*, 684 So. 2d 591, 596-98 (Miss. 1996) (There is no magic language to be used, but the expert opinion must clearly be given with the certainty required for admissibility.). Therefore, Dr. Atchison could have given his opinion without stating that it was within a degree of medical certainty, as long as the opinion was given with reasonable expert certainty. The record clearly shows that Dr. Atchison expressed his opinions within a "reasonable medical probability." This was adequate, and Jordan's contention otherwise is without merit.

¶110. Jordan's second contention is that Dr. Atchison's testimony was outside of his expertise and was nothing but "rank speculation." *See Fowler v. State*, 566 So. 2d 1194, 1199 (Miss. 1990). Jordan's expert, Dr. Leroy Riddick, testified that no one could have deduced the circumstances of Edwina's murder from the forensic evidence available. Dr. Riddick's testimony, however, did not preclude Dr. Atchison,

whose qualification as an expert was stipulated to by Jordan, from expressing a different opinion and offering his own theory of how the murder occurred.

¶111. Therefore, this issue is without merit.

## XIII. DID THE TRIAL COURT PROPERLY OVERRULE OBJECTIONS DURING THE CROSS-EXAMINATION OF DEFENSE EXPERT DR. RIDDICK?

¶112. Dr. Riddick testified on direct that Edwina could have been as far away as 30 yards or as close as 3 feet when she was shot, and that it was impossible to tell from the evidence collected anything more exact than that. On cross-examination, based on the statement that Jordan gave to the police, the State attempted to question Dr. Riddick about his opinions and asked him if Jordan, being a marksman, could have shot Edwina from 10 yards away. Dr. Riddick responded that he had no knowledge of Jordan's abilities as a marksman. Defense counsel objected on the basis of irrelevancy and the court overruled the objection.

¶113. On appeal, Jordan contends that the question was outside the scope of Dr. Riddick's expertise. However, this issue is procedurally barred since defense counsel objected to the question on relevancy grounds but never raised the issue of the question being outside the witness' expertise. *Doss v. State*, 709 So. 2d 369, 378 (Miss. 1996) ("an objection on one or more specific grounds constitutes a waiver of all other grounds").

¶114. Even if the issue were not procedurally barred, Jordan's claim is without merit. Dr. Riddick responded that he had no personal knowledge of Jordan being a marksman and offered his opinion solely on the basis of the gunshot wound and position of the body. Therefore, whether or not Jordan was a marksman was immaterial to his opinion. Since Dr. Riddick did not respond to the question, this issue is without merit.

¶115. Jordan also alleges that the trial judge should have sustained his objection to the State's question of whether Jordan could have pulled the revolver from his waistband, shot 30 yards and hit Edwina in the back of the head. Jordan's objection was that the question was argumentative and speculative. While the trial court ruled that Dr. Riddick was an expert and capable of giving a competent answer, Dr. Riddick responded that the only thing he was qualified to testify to was the distance of the shot based on the gunpowder and other forensic evidence. Again, since Dr. Riddick did not offer an opinion outside of his expertise, this assignment of error has no merit.

## XIV. WAS JORDAN'S CONFESSION TO OFFICER ALLBRITTON PROPERLY INTRODUCED?

¶116. Jordan contends that we should reconsider the admissibility of his statement to Officer Allbritton in light of the Supreme Court's ruling in *Michigan v. Jackson*, 475 U.S. 625, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986) (After a criminal defendant has requested counsel, any waiver of right to counsel during police-initiated questioning is invalid.). In this case, Jordan first requested counsel and then later waived his right to counsel and made a statement to Officer Allbritton. We addressed the validity of his statement and found that Jordan's waiver had been knowingly and voluntarily made. 365 So. 2d at 1202-03. The Fifth Circuit also held that Jordan had made a knowing, intelligent, and voluntary waiver because he was advised of his *Miranda* rights at least four times, and even recited them from memory. *Jordan v. Watkins*, 681 F.2d at 1074. In the two subsequent *Jordan* opinions by this Court, we have held that the issue had already been

decided and was barred by res judicata. 518 So. 2d at 1189 and 464 So. 2d at 480.

¶117. Jordan alleges that he should be able to relitigate this issue because more recent Supreme Court cases have held that rules for criminal prosecutions should be applied retroactively and that a criminal case is not final until the defendant is sentenced, makes a direct appeal, or seeks or fails to seek certiorari. *Powell v. Nevada*, 511 U.S. 79, 114 S. Ct. 1280, 1282, 128 L. Ed. 2d 1 (1994); *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L. Ed. 2d 649 (1987).

¶118. Despite his allegations that his case is not yet final, Jordan has received four appellate reviews of this issue, and we have now twice decided that the issue is procedurally barred. Most importantly, the issue is harmless error at best. Our initial decision on this issue showed the admission of that statement to Officer Allbritton was harmless since it was merely cumulative of the properly obtained statement that Jordan gave to FBI Agent Watts. *Jordan*, 365 So. 2d at 1203. Therefore, this issue is without merit.

## XV. WAS JORDAN PREVENTED FROM INTRODUCING RELEVANT MITIGATION EVIDENCE?

¶119. Jordan alleges that the trial court refused to allow him to introduce testimony by Parchman official Estelle Denley that, while she never had any problems with Jordan, she did with other inmates. Evidence of the behavior of other inmates was irrelevant, and the State's objection thereto was properly sustained.

¶120. Jordan also alleges that the trial court refused to allow introduction of testimony of Jordan's father concerning whether he ever saw Jordan's children. Evidence of a criminal defendant's death and the effect it would have on the life of his family is not relevant and is properly excluded since such evidence does not impact on the defendant's character, the record, or the circumstances of the crime. *Wilcher v. State*, 697 So. 2d 1123, 1133-34 (Miss. 1997). Similarly, the testimony of Jordan's cousin, Shirley Thames, was properly excluded for that same reason. Thames proposed to testify about the problems that Jordan's crime created for his family and for his relationship with his wife. Such testimony is not allowed under *Wilcher*. Also, Thames wanted to testify to Jordan's reputation in the community prior to 1976. This testimony was properly excluded since she did not live in the same community at that time.

¶121. After Thames testified that Jordan was "brought up in church by his parents," the State objected on the basis of hearsay, and the court sustained the objection. Thames could not so testify from personal knowledge, so the testimony was properly excluded. *See* M.R.E. 602. Moreover, Jordan was not prejudiced by the exclusion of Thames' proffered testimony because Jordan's brother testified without objection that he and Jordan:

> [grew] up together going to church together. We went to Sunday School together. . . . We attended Youth Rallies in High School quite a bit. We went all over the state with the youth rallies, which in the Church of God just youth groups get together for rallies and conventions and summer camps. . . . I know his family was a church going family because when I would go up and visit with them they were quite regular in the church there. He sang in the choir; his wife sang in the choir. He was an usher in the church. And when they came down to see us, we would go to church. And I know every time we would meet in Hattiesburg at my parents' home, we always went to church together. So, our family has always been very religious. I would say every time we were together, if it was a Sunday we went to church.

¶122. Therefore, this issue is without merit.

### XVI. DID THE TRIAL COURT PROPERLY ADMIT A STATEMENT BY OFFICER TOLLISON ABOUT JORDAN RESISTING ARREST AND PHOTOS OF THE MURDER VICTIM?

¶123. Officer Tollison is the officer who actually arrested Jordan. On cross-examination, Tollison admitted to defense counsel that Jordan had not resisted arrest and had fully cooperated with the police. On redirect, the State asked Tollison whether Jordan had made any complaints to him in the car after his arrest. Jordan objected, and the trial judge overruled the objection, concluding that the question was properly within the scope of the cross-examination. In response, Tollison relayed a humorous recounting by Jordan of a previous attempted arrest by Officer Larkin Smith and F.B.I. Agent Frank Watts. Jordan told Tollison that two "rednecks" had come down on him with weapons and Jordan had "hauled off and knocked their ass in the ditch." Tollison later learned that the two "rednecks" were Smith and Watts. Initially, the prosecution's questions seemed outside the scope of the direct and cross-examinations. However, the redirect actually elicited information concerning whether Jordan had fully cooperated with the police which was the subject of the cross-examination. Further, testimony concerning Jordan's altercation with Smith and Watts was introduced after the issue was raised by Jordan, so any error was harmless. This issue is without merit.

¶124. Jordan also alleges that it was erroneous for the trial court to admit a "gruesome" photograph of the victim. The admission of photographs is within the discretion of the trial judge who must determine that their probative value outweighs any prejudicial effect. *Bell v. State*, 725 So. 2d 836, 856 (Miss. 1998); *Underwood v. State*, 708 So. 2d 18, 33-34 (Miss. 1998); *Woodward v. State*, 726 So. 2d 524, 534-37 (Miss. 1997). The photograph was relevant and probative to demonstrate to the jury the exit wound and the trajectory of the bullet. The photograph showed Edwina as she was discovered by the police, fully clothed. There was very little blood and no brain matter or excessive blood to inflame the jury. In *Woodward,* we held that the discretion afforded the trial judge with regard to the admissibility of photographs is almost unlimited. *Id.* at 535. We have only once reversed a trial judge for the admission of gruesome photographs. *Id.* Just as in *Woodward*, the picture in this case does not rise to that level of gruesomeness. Therefore, this issue is without merit.

### XVII. DID THE TRIAL COURT PROPERLY OVERRULE JORDAN'S MOTION FOR A NEW TRIAL?

¶125. Jordan contends that it was improper for the trial court to overrule his motion for a new trial sua sponte and without a hearing. This issue has no merit. Jordan cites for authority Uniform Circuit and County Court Rule 10.05 which provides that a "trial judge may hear and determine a motion for a new trial . . . ." Clearly a hearing is discretionary, and nothing in the rule requires that a criminal defendant be afforded a hearing on his motion for a new trial. In addition, Jordan's motion for a new trial raised issues that are here before us on appeal and over which the trial court had already made a ruling after giving the defendant an opportunity to be heard on the same. The trial judge likely found that any additional hearing would merely be cumulative and a waste of time. In addition, Jordan has not been denied due process since he is able to present his additional issue before us on appeal. Therefore, this issue is without merit.

### XVIII. COULD THE TRIAL COURT ALLOW DEFENSE COUNSEL TO WAIVE JORDAN'S PRESENCE?

¶126. Jordan filed a pre-trial motion to assert his right to be present at all proceedings, including pre-trial hearings and bench conferences. A criminal defendant's right to be present at "critical stages" does not include the right to be present during bench conferences and the conference on jury instructions, since those matters are purely legal and the criminal defendant can do little to aid his defense. It is sufficient that his counsel is present. *Smith v. State*, 724 So. 2d 280, 308-12 (Miss. 1998). However, the real issue here seems to be the pre-trial hearing with regard to the appointment of Dr. Maggio. Jordan's counsel waived his presence at the beginning of the telephone hearing. Jordan contends that he did not knowingly waive his right to be present during the hearing and that his defense counsel's waiver of his presence prejudiced him since, had he known the outcome of the hearing that the prosecution would receive a copy of Dr. Maggio's report, then he would not have spoken so freely with Dr. Maggio. However, because we have found that it was not error for the State to receive a copy of the report, this issue is without merit.

## XIX. DID THE TRIAL COURT PROPERLY EXPLAIN TO JORDAN HIS RIGHT TO ALLOCUTION?

¶127. This issue is procedurally barred since there was no contemporaneous objection. Notwithstanding the procedural bar, we will address the merits of Jordan's claim.

¶128. Jordan expressed a desire to make an unsworn statement to the jury. The trial judge, in advising him of the ramifications of making such a statement, told Jordan that he must confine his statement to the evidence that was in the record and that the consequences of not confining his statement to the evidence of record would be that the State would be able to comment on his failure to take the stand. Actually, we have held that the result of a criminal defendant making an unsworn statement that exceeds the scope of the evidence is that the State can point out to the jury that no such statement was made under oath. *Bevill v. State*, 556 So. 2d 699, 710-11 (Miss. 1990).

¶129. While the trial court's statement was not exactly a true statement of the law, neither did it likely unduly prejudice Jordan. The trial judge asked Jordan to make a statement on the record for purposes of appellate review concerning why he decided not to make a statement to the jury. Jordan's response was that he felt his statement would go beyond the scope of the proof that was in evidence and that he preferred to just let his attorneys argue the evidence. Jordan did not state that he feared what the State might say about his failure to take the stand. He merely suggested he wanted to stay within the confines of the admitted evidence. Therefore, he was not prejudiced by the trial judge's slight misstatement of the consequences of his exercising his right to allocution.

## XX. SHOULD THE JURY HAVE BEEN ALLOWED TO CONSIDER BOTH THE KIDNAPPING AND THE PECUNIARY GAIN AGGRAVATING CIRCUMSTANCES?

¶130. Jordan raises three issues under this assignment of error. First, he claims that the kidnapping aggravator doubled up with the "especially heinous" aggravator. This issue has already been discussed above. *See* Issue II. Second, Jordan alleges that submitting both a kidnapping and pecuniary gain instruction to the jury violated his right to due process and is an ex post facto application. This Court and the Fifth Circuit have already decided this issue adversely to Jordan. *Jordan v. Watkins*, 681 F.2d at 1079; *Jordan v. State*, 464 So. 2d at 482. Therefore, the issue is barred and without merit. Third, Jordan claims that the kidnapping instruction doubled up with the pecuniary gain instruction. Again, we have already decided this issue adversely to Jordan. *Jordan v. State*, 464 So. 2d at 478-79. Therefore, the issue is both without merit and procedurally barred.

**XXI. WAS JORDAN GIVEN A SUFFICIENT OPPORTUNITY TO ASK QUESTIONS IN VOIR DIRE CONCERNING THE DEATH PENALTY AND MITIGATING CIRCUMSTANCES?**

¶131. Jordan contends that during voir dire he was not allowed to ask whether the veniremen's views of the death penalty would substantially impair their ability to consider a life sentence and whether they thought that any of the mitigating factors that Jordan intended to prove were irrelevant. Trial courts have broad discretion in determining the extent and propriety of questions posed to potential jurors. An abuse of discretion can be shown only when prejudice is demonstrated. *McGilberry v. State*, 741 So. 2d 894, 912 (Miss. 1999).

¶132. The trial court reviewed proposed voir dire questions in a pre-trial hearing. He allowed the question of whether the veniremen would automatically vote for the death penalty.

¶133. The State objected to a question proposed by the defense because it did not track *Witt v. Wainwright,* 470 U.S. 1039, 105 S. Ct. 1415, 84 L. Ed. 2d 801 (1985). The judge sustained the objection and stated that he would follow the *Witt* standard, asking the veniremen if their views were such that they would substantially impair the performance of their duties as a juror in accordance with the instructions. The defense then proposed a question asking if the veniremen deemed any of the mitigating factors Jordan intended to prove irrelevant to their sentencing decision. The court sustained the State's objection, stating that the case law did not require him to ask that question.

¶134. Jordan can show no prejudice from the trial judge's refusal to follow Jordan's proposed voir dire questions. He merely reworded the *Witt* question to follow the ruling in that case. As to the question whether the jury members would believe that his mitigating evidence was irrelevant, defense counsel may not use hypothetical questions to secure a commitment from the jurors concerning the verdict they will render. *Evans v. State*, 725 So. 2d at 650. Here, the trial judge cautioned defense counsel concerning *Evans*, but told defense counsel that he would not prohibit the asking of philosophical questions concerning their beliefs on the death penalty or life imprisonment. The trial judge's instructions and questions were within the confines of our precedent, and it cannot be said that he abused his discretion or prevented Jordan's counsel from fully inquiring into the potential jurors beliefs concerning the death penalty. Therefore, this issue is without merit.

**XXII. WAS THE JURY PROPERLY LIMITED TO QUALIFIED ELECTORS OR FREEHOLDERS OF MORE THAN ONE YEAR, OVER THE AGE OF 20 AND LITERATE?**

¶135. Jordan contends that Miss. Code Ann. § 13-5-1 (1972) is unconstitutional and violates his right to jury composed of a fair cross section of the community. This issue is procedurally barred because Jordan did not raise it in the trial court.

¶136. The issue is further without merit as we have held that Mississippi's jury eligibility statute with regard to age and literacy is constitutional. *Edwards v. State*, 737 So. 2d at 318-19; *Wilson v. State*, 574 So. 2d 1324 (Miss. 1990); *Turner v. State*, 573 So. 2d 657 (Miss. 1990). The Legislature has also added the qualifier of freeholder for the very reason that jury members would not be limited to registered voters, *Brown v. State*, 240 So. 2d 291, 292 (Miss. 1970), thereby expanding the list of qualified venire.

Therefore, this issue is without merit.

### XXIII. WAS THE DEFENDANT ENTITLED TO PROPOSED INSTRUCTION NO. D-2(B)?

¶137. Jordan proposed a jury instruction as follows:

> The Court instructs the jury that it is not the fault of the Defendant that the case is twenty-two (22) years old. That the reason for the delay is error on behalf of the State.

¶138. Jordan states that he was entitled to the instruction because the prosecutor repeatedly used the age of the case as a reason to impose the death penalty. For authority, Jordan cites only *Giles v. State*, 650 So. 2d 846 (Miss. 1995). A review of *Giles* reveals no authority for the instruction to be granted.

¶139. Jordan is correct that remarks about the age of the case tended to include an implication that Jordan should be blamed therefor. For example, in closing arguments, the State argued that Jordan's "charade" of living the good life at Parchman was offensive to the family of the victim, who were there in the courtroom 22 years later, still putting up with Jordan. The State referred to the age of the case many times, in effect telling the jury that he had run out of patience with Jordan and so should they.

¶140. The fact that Jordan had yet to be sentenced was neither the State's nor Jordan's fault. Therefore, there was no error in failing to grant an instruction that was factually inaccurate.

### XXIV. JURY INSTRUCTIONS.

¶141. Jordan failed to raise contemporaneous objections to the jury instructions about which he complains, so he is procedurally barred from raising this issue on appeal. Nevertheless, we will address the merits of his claim.

¶142. First, Jordan asserts that the trial judge misstated the law during voir dire and when reading the jury instructions to the jury at the end of trial. During voir dire, the trial judge stated that the jury must consider the aggravating factors and whether those substantially outweighed the mitigating factors as proven by the defense. The State requested a bench conference after which the trial judge clarified that the jury must find the aggravating factors beyond a reasonable doubt. The judge did not misstate the law, but merely neglected to mention the "beyond a reasonable doubt" standard. This error was quickly corrected by the State, and the jury was properly instructed concerning the reasonable doubt standard during jury instructions. Jordan asserts yet again that record is deficient on this point. However, since the jury was properly instructed, this issue is without merit.

¶143. Jordan also alleges that the trial judge made a mistake in reading the jury instructions to the jury. After the reading of the jury instructions, the judge asked the attorneys if they had approved the grammatical changes to the jury instructions. He indicated that he had made corrections to C-6, but had failed to read the corrected version to the jury. C-6 is a standard instruction telling the jury that the instructions are in no particular order of importance and explaining the procedure and weight of closing arguments. Defense counsel indicated that there was no problem with the instruction as read. This issue is without merit.

¶144. Second, Jordan objects that the jury instructions set forth the possible verdicts before the mitigating

factors, risking that the jury considered its verdict before considering any of the mitigating circumstances. Jordan cites *Stewart v. State*, 662 So. 2d 552, 564 (Miss. 1995), wherein we held that failure to include a signature line after the life option at the bottom of a jury instruction impermissibly attracted jurors' attention away life as a sentencing option. We further stated that it would not tolerate facial defects in sentencing instructions on death penalty cases. *Id.*

¶145. In determining whether error lies in the granting or denying of jury instructions, the instructions must be read as a whole to determine if they fairly announce the law of the case. *Edwards,* 737 So. 2d at 305; *Coleman v. State*, 697 So. 2d 777, 782 (Miss. 1997). In this case, the jury was adequately instructed concerning how the factors should be considered in considering the options and how to form a verdict. It cannot be concluded that putting the sentencing options before the explanation of aggravating and mitigating circumstances confused the jury or impermissibly distracted them from their obligations under the law. Therefore, this issue is without merit.

¶146. Third, Jordan alleges that the trial court erred in failing to instruct the jury as to the statutory mitigating factors. The State contends that Jordan himself submitted the jury instruction to consider the mitigating circumstances, and he should not now be allowed to object to his own instruction. *Carr v. State*, 655 So. 2d 824 (Miss. 1995). Jury instructions should not be vague, but should conform to the evidence. Therefore, the fact that the judge did not instruct the jury concerning mitigating factors that were irrelevant to the evidence in this case was not erroneous.

¶147. Fourth, Jordan asserts that he was entitled to a "catch-all" instruction that would have instructed the jury that they were entitled to consider any non-statutory mitigating circumstances. *See Jackson v. State*, 684 So. 2d 1213, 1238 (Miss. 1996). However, Jordan did not propose such an instruction, nor did he include similar type language in his mitigating instruction that was submitted. The trial judge has no obligation to draft and give every allowable jury instruction in a death penalty case, but it is the obligation of Jordan to submit the instructions he desires to have given. He did not propose a "catch-all" instruction, and therefore, it was not erroneous for the trial judge not to have given one. However, Jordan's argument here may have merit due to his pre-trial motion to declare unconstitutional the capital punishment scheme, since Jordan alternatively sought a "catch-all" instruction. *See* Issue XXV below. Since that motion was denied, Jordan may overcome the procedural bar on this issue. Failure to give a "catch-all" instruction may be grounds for reversal in this case.

¶148. Fifth, Jordan claims that the court should not have given Instruction No. C-1, that the jury was not to be influenced by sympathy. We have considered this exact issue in *Holland v. State*, 705 So. 2d at 351, where we approved a jury instruction which reads verbatim like the one about which Jordan complains. In *Holland*, we found that such an instruction does not mean that the jury should totally disregard sympathy and is, therefore, permissible.

¶149. Sixth, Jordan claims that the jury instructions erroneously implied that the jury members must unanimously find that the mitigating factors existed before they could be considered. However, the State points out that the jury was instructed in Instruction No. D-3 that "you should each evaluate the evidence in mitigation and, if one juror believes a mitigation circumstance exists, he or she must weigh it in the balance even if the other eleven jurors disagree." Therefore, the jury was not led to believe that it must find the mitigating circumstances unanimously before they could be considered.

¶150. Seventh and Eighth, Jordan argues that Instruction No. 1 improperly implies that there is a burden-

shifting from the State to the defendant, and that the instruction fails to adequately advise the jury concerning how to weigh the aggravating and mitigating factors to determine whether death should be imposed. As Jordan himself points out, we have considered and denied such arguments in approving a similarly-worded jury instruction to the one at issue in *Evans v. State*, 725 So. 2d at 694-96. Therefore, this issue is without merit.

¶151. Ninth, Jordan asserts that the jury should not have been instructed to consider the "detailed circumstances of the offense." However, we have held that such an argument would "defy logic and reason as well as the explicit language of § 99-19-101(1)." ***Doss,*** 709 So. 2d at 395-96; *see also* ***Edwards,*** 737 So. 2d at 314; ***Turner,*** 732 So. 2d at 953-54. This issue is without merit.

¶152. Tenth, Jordan asserts that the jury was not instructed on the four elements of Miss. Code Ann. § 99-19-101(7) (2000). That section provides:

> (7) In order to return and impose a sentence of death the jury must make a written finding of one or more of the following:
>
> (a) The defendant actually killed;
>
> (b) The defendant attempted to kill;
>
> (c) The defendant intended that a killing take place;
>
> (d) The defendant contemplated that lethal force would be employed.

¶153. We addressed this assignment of error in ***Watts v. State***, 733 So. 2d at 242. We held that, since the statute provides that the jury find only one of these elements, the verdict is sufficient as long as one is included, and the jury need not be instructed on the other three elements. ***Id.*** Therefore, this issue is without merit.

¶154. Eleventh, Jordan asserts that the jury should not have been instructed that they must unanimously decide to impose a sentence of life imprisonment without the eligibility for parole, as Miss. Code Ann. § 99-19-101 does not so provide. Miss. Code Ann. § 99-19-101 provides in pertinent part:

> (3) For the jury to impose a sentence of death, it must *unanimously* find in writing the following:
>
> (a) That sufficient factors exist as enumerated in subsection (7) of this section;
>
> (b) That sufficient aggravating circumstances exist as enumerated in subsection (5) of this section; and
>
> (c) That there are insufficient mitigating circum-stances, as enumerated in subsection (6), to outweigh the aggravating circumstances.
>
> In each case in which the jury imposes the death sentence, the determination of the jury shall be supported by specific written findings of fact based upon the circumstances in subsections (5) and (6) of this section and upon the records of the trial and the sentencing proceedings. *If, after the trial of the penalty phase, the jury does not make the findings requiring the death sentence or life imprisonment without eligibility for parole, or is unable to reach a decision, the court shall impose a sentence of life imprisonment.*

(emphasis added). It is clear from the italicized language that the jury must make a responsive, unanimous decision to sentence a defendant to death or life imprisonment without parole. The only decision that need not be unanimous is life imprisonment. Therefore, this issue is without merit.

### XXV. DID THE TRIAL COURT ERR BY OVERRULING JORDAN'S MOTION TO DECLARE MISSISSIPPI'S CAPITAL PUNISHMENT UNCONSTITUTIONAL, OR TO LET THE JURY CONSIDER ALL REASONS OFFERED BY JORDAN AS MITIGATORS IN SUPPORT OF A LIFE SENTENCE?

¶155. The trial court denied a pre-trial motion to declare the capital punishment scheme unconstitutional or to permit the jury to consider non-statutory mitigating factors in support of a lesser sentence than death. Jordan reasoned that the statutory list of mitigating factors was too restrictive because it required a finding of "extreme" emotional disturbance or duress or a finding that the criminal defendant's ability to comprehend the criminality of his actions was "substantially" impaired. Miss. Code Ann. § 99-19-101(6) (2000).

¶156. Regardless of any merit this claim may have, Jordan cannot prove any prejudice to him based on the statutory language and, therefore, his challenge to the unconstitutionality of the statute must fail. Jordan submitted as mitigating factors only those that are included in Jury Instruction No. 1, and none of those mitigators describe impairment of mental capacity or emotional duress or disturbance. Since the jury did not consider the possible unconstitutional mitigators, Jordan cannot raise this issue on appeal.

### XXVI. DOES JORDAN'S SENTENCE VIOLATE DOUBLE JEOPARDY?

¶157. Jordan contends that his sentence of death in this case violates double jeopardy since he had already been sentenced to life imprisonment. We considered this argument in ***Lanier v. State***, 635 So. 2d 813 (Miss. 1994), and a four-member majority rejected the argument. We have since reaffirmed its holding in ***Patterson v. State***, 660 So. 2d 966 (Miss. 1995),with a seven-member majority. Therefore, Jordan's argument that ***Lanier*** holds no precedential value is without merit. Moreover, we stated what procedure would be used in Jordan's case in our unpublished order vacating Jordan's sentence. ***Jordan v. State***, No. 95-KP-00113-SCT. We relied specifically on our holding in ***Lanier*** and found that Jordan would once again be subject to the death penalty. ***Lanier*** concludes that such a holding does not violate double jeopardy. Therefore, this issue is without merit.

### XXVII. DID THIS COURT ERR IN ORDERING A NEW CAPITAL SENTENCING TRIAL FOR JORDAN, EXPOSING HIM AGAIN TO CAPITAL PUNISHMENT?

¶158. Jordan is barred from raising this issue since he filed neither a motion for rehearing nor a petition for certiorari to the Supreme Court.

¶159. In addition, as explained in the above issue, we have spoken authoritatively on the matter and have found this issue to be without merit.

### XXVIII. WOULD JORDAN'S EXECUTION VIOLATE THE EIGHTH AMENDMENT?

¶160. Jordan did not make this argument at trial and is procedurally barred from raising it for the first time on appeal.

¶161. Jordan argues that he has been incarcerated on death row from the time the crime was committed in

this case, in 1976, until 1991, and then again in 1998, when the life sentence was vacated, until now. He claims that he has suffered psychological trauma waiting for his execution and that there is nothing gained by the State from 22 years of needless infliction of pain and suffering. He indicates that the United States Supreme Court has held that the death penalty violates the Eighth Amendment when it makes no measurable contribution to acceptable goals of punishment, i.e., retribution and deterrence, and is nothing more than needless imposition of pain and suffering. *Penry v. Lynaugh*, 492 U.S. 302, 335, 109 S. Ct. 2934, 2956, 106 L. Ed. 2d 256, 289 (1989). Jordan also points out that Justices Stevens and Breyer have opined that there may be a valid Eighth Amendment challenge for someone who has spent many years on death row. *Lackey v. Texas*, 514 U.S. 1045, 115 S. Ct. 1421, 131 L. Ed. 2d 304 (1995) (memorandum of Stevens, J., respecting the denial of certiorari). However, a denial of certiorari has no precedential value. Moreover, Justice Thomas responded to Justices Stevens and Breyer when he noted that the Constitution would not protect a defendant who availed himself of the "panoply of appellate and collateral procedures" and then claimed that his execution had been too long delayed. *Knight v. Florida*, 528 U.S. 990, 120 S. Ct. 459, 145 L. Ed. 2d 370 (1999) (Thomas, J., concurring in the denial of certiorari). There is no precedent which supports Jordan's contention that his Eighth Amendment right against cruel and unusual punishment has been violated. Therefore, there are no grounds for reversal on this issue.

### XXIX. DID THE TRIAL COURT PROPERLY OVERRULE JORDAN'S MOTION TO PRECLUDE THE STATE FROM USING PEREMPTORY CHALLENGES AGAINST JURORS WHO EXPRESSED RELIGIOUS OR OTHER RESERVATIONS ABOUT THE DEATH PENALTY, BUT WHO COULD NOT BE EXCUSED FOR CAUSE?

### XXX. DID THE TRIAL COURT PROPERLY OVERRULE JORDAN'S MOTION TO PRECLUDE THE STATE FROM USING PEREMPTORY CHALLENGES TO EXCLUDE JURORS WHO EXPRESSED RESERVATIONS ABOUT THE DEATH PENALTY, BUT WHO COULD NOT BE EXCUSED FOR CAUSE?

¶162. Jordan raises two assignments of error that are essentially the same except for the rationale. First, he alleges that the trial court should have precluded the State from using peremptory challenges against jurors who expressed reservations about the death penalty because it allowed discrimination based on religion contrary to the dictates of the Mississippi Constitution. Second, Jordan alleges that the exercise of such peremptory challenges denied him a jury composed of a fair cross-section of the community. We have held that a prospective juror's views on the death penalty do not make one a member of a distinctive class protected by *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and its progeny. *Holland,* 705 So. 2d at 340-41. Therefore, the State was not prohibited from exercising peremptory challenges to strike jurors based on their beliefs concerning the death penalty. *Id.* at 341. Additionally, excusing all jurors who have conscientious scruples against the death penalty does not deny a defendant his right to a representative cross-section of the community. *Cole v. State*, 485 So. 2d 681, 685 (Miss. 1985). Therefore, these issues are without merit.

### XXXI. SHOULD THE TRIAL COURT HAVE ALLOWED JORDAN TO RELITIGATE EACH AND EVERY FACT RELATING TO HIS GUILT OR INNOCENCE OF CAPITAL MURDER, OR, ALTERNATIVELY, TO LIMIT THE STATE'S ABILITY TO PROVE KIDNAPPING AS AN AGGRAVATING FACTOR?

¶163. Jordan contends that he was entitled to relitigate his guilt or innocence during this sentencing phase of

his trial, present evidence and argue for residual doubt in favor of his innocence. In addition, or alternatively, Jordan alleges that the State should not have been allowed to prove kidnapping as an aggravating factor because he had the right to prove he was innocent of the charge. We definitively and at length addressed this issue in *Holland v. State*, 705 So. 2d at 321-329. Based on our precedent, then, this assignment of error has no merit.

## XXXII. DID THE TRIAL COURT ERR IN OVERRULING JORDAN'S MOTION TO DECLARE MISS. CODE ANN. § 97-3-19(2)(e) UNCONSTITUTIONAL?

¶164. Jordan argues that Mississippi's capital murder statutory scheme is unconstitutional because it does not require the State to prove deliberate design when a defendant is charged with murder while in the commission of kidnapping (or other felonies). Miss. Code Ann. § 97-3-19(2)(e) (2000). In other words, a criminal defendant may be sentenced to death without a finding that the criminal defendant had intended to kill. In support, Jordan cites *Edmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982), where the Supreme Court held that it was unconstitutional to execute a criminal defendant without the jury finding specifically that the defendant had actually killed, attempted to kill, intended to kill, or contemplated that lethal force would be employed. We have interpreted *Edmund* to hold that the factors are read in the disjunctive, so that it is sufficient and necessary that the jury find one *Edmund* factor before a defendant can be sentenced to death. *Holland,* 705 So. 2d at 327. Regardless of intent, all that is constitutionally required is that the jury find, as here, that Jordan actually killed. Therefore, this issue is without merit.

## XXXIII. JORDAN REURGES ALL ISSUES AND ARGUMENTS PREVIOUSLY MADE REGARDING THE GUILT INNOCENCE PHASE OF HIS TRIAL.

¶165. This assignment of error is procedurally barred since we have already addressed the issues that were properly raised in Jordan's previous appeals. *Jordan v. State*, 518 So. 2d 1186 (Miss. 1987); *Jordan v. State*, 464 So. 2d 475 (Miss. 1985); *Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

## XXXIV. CUMULATIVE ERROR.

¶166. Jordan alleges that cumulative error in this case require reversal of his sentence of death. Since we did not find reversible error in any of Jordan's issues, this claim is without merit.

## XXXV. REVIEW PURSUANT TO MISS. CODE ANN. § 99-19-105(3) (2000).

¶167. Pursuant to Miss. Code Ann. § 99-19-105(3) (2000), in addition to reviewing the merits of those issues raised by Jordan, we are required to determine:

(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

(b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101; and

(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

¶168. Our assessment therefore must consist of examining other death penalty cases reviewed by on appeal, the crime and the defendant. *McGilberry*, 741 So. 2d at 924; *Wilcher v. State*, 697 So. 2d at 1113.

¶169. We find that the sentence of death in this case was not influenced by passion, prejudice or any other arbitrary factor. After hearing evidence of mitigating circumstances from several witnesses, the jury was fairly instructed upon all of the mitigating circumstances put forward by Jordan. Based on a review of all of the evidence before the court, we find that it was reasonable for the jury to disregard as implausible Jordan's defense of an accidental shooting.

¶170. The evidence supports the jury's findings of statutory aggravating circumstances as enumerated in Miss. Code Ann. § 99-19-105(5) (2000). Jordan did not even contest the facts that he kidnapped Edwina, that she was killed, and that he extorted Edwin's husband for ransom money. We refer to the thorough discussion above of whether the crime was heinous, atrocious and cruel, and find that the evidence does support a finding that Jordan's acts were heinous, atrocious and cruel.

¶171. Finally, the sentence of death in this case is neither excessive nor disproportionate to those cases in which such sentence has been imposed and upheld. *See* Appendix. Jordan's acts were cold-blooded and premeditated. He carefully picked a victim by calling a bank and watching the Marters' residence until he could gain easy entrance. He played the role of a General Electric representative. He bought and altered a clipboard as part of his costume. He gained entrance to the Marters' residence by claiming that the breakers needed to be checked. After he seized Edwina, he drove her to a remote place and killed her execution style. He then cold-heartedly told Charles for two days that Edwina was alive and well. These acts reflect Jordan's lack of conscience and scheming nature and show that Jordan views other people as mere means to further his own desires.

## CONCLUSION

¶172. For the reasons set forth above, Jordan's arguments are without merit. We affirm the sentence of death imposed by the Harrison County Circuit Court.

¶173. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION AFFIRMED.**

**MILLS, COBB, DIAZ AND EASLEY, JJ., CONCUR. BANKS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. McRAE, P.J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. PITTMAN, C.J., AND SMITH, J., NOT PARTICIPATING.**

**BANKS, PRESIDING JUSTICE, DISSENTING:**

¶174. Because I differ with the majority with regard to the issues of prosecutorial vindictiveness and the evidentiary support for the especially heinous, atrocious and cruel aggravator, I respectfully dissent.

I.

¶175. The majority answers Jordan's claim regarding prosecutorial vindictiveness by suggesting that the issue is somehow obviated by the fact that this Court explicitly held that Jordan, in a new sentencing hearing

would be exposed to the death penalty. Prosecutorial power to seek the greater punishment is a prerequisite to rather than a negation of vindictiveness. Indeed, the policy against prosecutorial vindictiveness need never be resorted to in instances where the proposed and opposed prosecutorial action is beyond the legal power of the prosecutor. Acting vindictively is an abuse of prosecutorial power, not the want of that power. *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628, (1974). The Supreme Court in *Blackledge* noted:

> The lesson that emerges from *Pearce*, *Colton*, and *Chaffin* is that the Due Process Clause is not offended by all possibilities of increased punishment upon retrial after appeal, but only by those that pose a realistic likelihood of 'vindictiveness' . . . The question is whether the opportunities for vindictiveness in this situation are such as to impel the conclusion that due process of law requires a rule analogous to that of the *Pearce* case. We conclude that the answer must be in the affirmative.

> A prosecutor clearly has a considerable stake in discouraging convicted misdemeanants from appealing and thus obtaining a trial de novo in the Superior Court, since such an appeal will require increased expenditures of prosecutorial resources before the defendant's conviction becomes final, and may even result in a formerly convicted defendant's going free.

*Id.* at 27.

¶176. Jordan's claim simply put, is that in 1991 when the prosecutor had the power to pursue the death penalty and reject any offer of a plea, the prosecutor exercised discretion and accepted the offer of a plea in exchange for a sentence of life without parole. In 1998, after the former sentence was overturned by this Court because it was without legal authority, the prosecutor was faced with the same options, except for the fact that by this time, because of a change in the law, the life without parole option was legal. Miss. Code Ann. § 97-3-21 (2000)(amended in 1994 and allowing for a sentence of life imprisonment without the possibility of parole.); *Taveras v. State*, 725 So.2d 803, 808 (Miss. 1998). Without explanation, the prosecutor refused to accept the same plea bargain agreement. Jordan suggests that the only reason for refusing to accept his offer of a plea was prosecutorial vindictiveness in retaliation for his exercise of his right to test the legality of the 1991 sentence.

¶177. While there may be an explanation for the change in heart which meets the test necessary to avoid a conclusion that the prosecution was unconstitutional as vindictive, we are not favored with it because the trial court refused to conduct a hearing or otherwise require the prosecutor to explain his change of heart. In my view, this is error. It is especially so in a case such as this prosecuted by a private actor rather than an elected prosecutor charged with a responsibility to the public as opposed to individual clients retaining him, with or without fee, for that purpose. I would remand this matter to the trial court for a hearing on the issue of prosecutorial vindictiveness.

## II.

¶178. The majority's response to the question of whether there is sufficient evidentiary support for the troublesome aggravator -especially heinous, atrocious and cruel- is equally wanting. First, the suggestion that there is some procedural bar to our consideration of this issue ignores our statute compelling review of the evidentiary basis for aggravating factors, with or without an appeal. Miss. Code Ann. § 99-19-105(1), (2) & (3)(b). *Manning v. State*, 735 So.2d 323, 349 (Miss. 1999)(holding that there can be no procedural bar because this Court is required by statute to review the sufficiency of the evidence supporting

the jury's finding of aggravated circumstances); *Underwood v. State*, 708 So.2d 18, 39 (Miss. 1998). There is no procedural bar.

¶179. On the merits of the issue the majority suggests that we have previously ruled that the victim here was "unnecessarily tortured, either mentally or physically." To be sure, while not using that language, this Court, in a previous opinion concerning a previous trial, referred to the prevailing definition of the term especially heinous, atrocious or cruel and accepted a view of the record made at that time as adducing the necessary proof. *Jordan v. State*, 464 So. 2d 475, 478 (Miss. 1985). Today's review, however, is of the record made in this trial.

¶180. There is no proof in this record which would support a conclusion, beyond a reasonable doubt, that the crime was heinous, atrocious or cruel. There was absolutely no evidence of physical torture prior to Marter's death. Likewise, there was no evidence that Jordan intended to inflict a high degree of pain with indifference to, or even enjoyment of, Marter's suffering.

¶181. There is some doubt as to how the killing occurred. That is, whether the killing occurred "execution style" or while the victim was running away. "Execution-style" killings by themselves do not involve a great deal of pain to the victim and do not afford the opportunity for the defendant to enjoy suffering because usually death is instantaneous, as it appears it was in this case. We do not know whether Marter was aware she was about to be killed, whether she pled for her life, whether Jordan played "mind games" with her prior to the shooting, etc.

¶182. Marter was undoubtedly very scared when she was kidnaped and driven to a remote spot, and she was undoubtedly very upset because she had to leave her three-year-old child unattended. But these inferences alone do not rise to heinousness, atrocity or cruelty. The evidence, particularly the angle and path of the bullet (it entered in the lower part of the head, traveled upwards, and exited over on of the eyes), tends to show that Jordan killed Marter "execution-style." If this type killing occurred, it would be reasonable to infer that Jordan's action were cold-hearted and calculated, but cold-heartedness and calculation are not sufficient to prove this aggravator. In order to find this aggravator the jury must conclude that the crime is a "conscienceless and pitiless crime which is *unnecessarily torturous* to the victim." *Coleman v. State*, 378 So.2d 640, 648 (Miss.1979) (emphasis added) (the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies--the conscienceless or pitiless crime which is unnecessarily torturous to the victim). *Accord,* *Manning v. State,* 735 So.2d at 349 (quoting *Lockett v. State*, 614 So.2d 888, 895 (Miss. 1993)). There is no proof here that the murder was unnecessarily tortuous.

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Mitchell v. State,* 1998-DP-01785-SCT, 2001 WL 302751 (Miss. March 29, 2001).

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999).

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1123 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

**\*Jones v. State**, 517 So. 2d 1295 (Miss. 1987)**, Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

**Wiley v. State**, 484 So. 2d 339 (Miss. 1986).

**Johnson v. State**, 477 So. 2d 196 (Miss. 1985).

**Gray v. State**, 472 So. 2d 409 (Miss. 1985).

**Cabello v. State**, 471 So. 2d 332 (Miss. 1985).

**Jordan v. State**, 464 So. 2d 475 (Miss. 1985).

**Wilcher v. State**, 455 So. 2d 727 (Miss. 1984).

**Billiot v. State**, 454 So. 2d 445 (Miss. 1984).

**Stringer v. State**, 454 So. 2d 468 (Miss. 1984).

**Dufour v. State**, 453 So. 2d 337 (Miss. 1984).

**Neal v. State**, 451 So. 2d 743 (Miss. 1984).

**Booker v. State**, 449 So. 2d 209 (Miss. 1984).

**Wilcher v. State**, 448 So. 2d 927 (Miss. 1984).

**Caldwell v. State**, 443 So. 2d 806 (Miss. 1983).

**Irving v. State**, 441 So. 2d 846 (Miss. 1983).

**Tokman v. State**, 435 So. 2d 664 (Miss. 1983).

**Leatherwood v. State**, 435 So. 2d 645 (Miss. 1983).

**Hill v. State**, 432 So. 2d 427 (Miss. 1983).

**Pruett v. State**, 431 So. 2d 1101 (Miss. 1983).

**Gilliard v. State**, 428 So. 2d 576 (Miss. 1983).

**Evans v. State**, 422 So. 2d 737 (Miss. 1982).

**King v. State**, 421 So. 2d 1009 (Miss. 1982).

**Wheat v. State**, 420 So. 2d 229 (Miss. 1982).

**Smith v. State**, 419 So. 2d 563 (Miss. 1982).

**Johnson v. State**, 416 So. 2d 383 (Miss.1982).

**Edwards v. State**, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

*Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO

## GUILT AND SENTENCE PHASE

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

**DEATH CASES REVERSED**

**AS TO PUNISHMENT AND REMANDED**

## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## ON SENTENCING PHASE ONLY

*King v. State*, 1998-DP-01134-SCT, 2001 WL 393931 (Miss. Apr. 19, 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*****Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

**Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*****Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*****Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied* *Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

*Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

1. For a more detailed description of the crime, see our extensive treatment at *Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

2. The examinations of Jordan by Dr. Davis and Dr. Maggio were both performed at the request of defense counsel.

3. As stated previously, Owen, as Assistant District Attorney under then District Attorney Albert Necaise in 1976 and 1977, participated in Jordan's first two trials. After he left the District Attorney's Office, Edwina's family apparently requested that he be appointed special prosecutor to participating in all of the subsequent

trials and hearings.

4. Under this assignment of error, Jordan also complains that Owen argued facts which were not in evidence when Owen "argued repeatedly that Jordan had benefitted financially from his time at Parchman." This claim will be discussed under Issue VII, infra.

5. Under this assignment of error, Jordan claims that Owen "repeatedly disparaged the severity of a life sentence," and said that Jordan had an "easy life" in prison, and that a sentence of life imprisonment "would be a travesty of justice." The merits of this claim were discussed under Issue VI, supra, and will not be addressed again.